O'Hara *versus* Stack.

1. In matters of faith and doctrine, churches are left to speak for themselves, but when rights of property are in question, courts will interfere.

2. The profession of a priest is his property, and a prohibition of the exercise of that profession by his bishop, without accusation or hearing, is contrary to the law of the land.

3. The right of a priest to the revenues of his church derived from pew-rents and voluntary offerings, though uncertain in amount and there is no specified salary, is a right of property which the law will recognise.

4. A Roman Catholic bishop forbade a priest in his diocese to exercise any priestly function, and removed him from the church in which he ministered without assigning him to another, although the bishop denied that such removal was by way of punishment. This was done without an accusation, hearing or trial. The priest had no fixed salary, but derived an income from the rent of the pews in the church. *Held*, that the act of the bishop was unlawful, and that a court of equity would interfere on behalf of the priest.

5. In courts of equity, costs are in the sound discretion of the chancellor. They do not necessarily fall on the wrong party as they do at law.

6. Per SHARSWOOD, C. J.—It appeared to me, that whether the appellant had or had not the power which he assumed and exercised over the appellee, that in reason and good conscience he was bound to make known to him the ground of his proceeding. * * * In concurring in the decree of affirmance, all that I meant to decide and all that I think was meant to be decided was, that under the special circumstances of the case, the judge below exercised a sound discretion when he refused to impose all the costs on the appellee.

June 6th 1879. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ. WOODWARD, J., absent.

[O'Hara v. Stack.]

Appeal from the decree of the Court of Common Pleas of *Lycoming county :* Of May Term 1878, No. 70. In equity.

Bill in equity filed by the Rev. M. P. Stack against the Rt. Rev. William O'Hara.

The bill averred that plaintiff "is a regularly ordained priest in the ministry of the Catholic Church, and was appointed by Bishop Wood, in 1866, pastor of the non-German Catholics of Williamsport; that he was charged with the duty of organizing a parish or congregation, procuring means to erect a church and of ministering the same; that by diligent application he was successful in these objects, and the Church of the Annunciation was built and dedicated in 1868, and from that time he was and remained, and avers he is entitled to remain the duly constituted pastor of said church without let or hindrance; that as such pastor he has been in the enjoyment of an annual income derived from renting of pews and other perquisites, and avers he is entitled to a continuance of the same.

"That the Diocese of Scranton, in which said church is situated, was erected in 1868, out of the Diocese of Philadelphia, and Rt. Rev. William O'Hara became its Bishop.

"That on the 6th of November 1871, plaintiff received from Bishop O'Hara the following note :

" Rev. M. P. STACK.

" Rev. Sir : Your administration of the affairs connected with the Church of the Annunciation has been such that I feel myself compelled to remove you, and leave the church vacant. And I now forbid you to exercise any priestly functions in Williamsport, even to say mass. This prohibition binds *sub gravi.* You may call on me at Scranton, and I will inform you of my further intention in your regard.

" November 5.                         " W. O'HARA,
                                              " Bp. Scranton."

. " And avers that he believes the said Bishop adheres to his determination to remove him, the plaintiff, from said church, and to deprive him of his revenues, rights and perquisites, and to close the church against him and the congregation entitled to worship therein; that the congregation are attached to their priest, and their wish is that he be not removed; that the plaintiff is not aware of any act done or left undone by him to justify ecclesiastical censure or punishment, and no such act or thing has been designated; that no formal or regular accusation, investigation or trial has been had, or any opportunity afforded him to disprove or explain any supposed fault or offence; that the intended removal and enforcement thereof upon the grounds alleged is unwarranted by the law of the Catholic Church, and is contrary to the law of the land; that the prohibition binding ' *sub gravi*" is also contrary to the law of the Catholic

[O'Hara v. Stack.]

Church, and is an attempt, by an exercise of arbitrary power, to prevent the plaintiff from asserting and enjoying his rights:

"And prays as follows:

"1. That the removal, or attempted removal by the bishop of the Rev. Mr. Stack as pastor of the Church of the Annunciation, was unlawful and void.

"2. That the prohibition of the defendant, directed to the plaintiff, forbidding him to exercise any priestly functions in Williamsport, even to say mass, was unlawful and void.

"3. That defendant be restrained by injunction from removing the plaintiff as pastor of said church.

"4. That the defendant be restrained against prohibiting the plaintiff from saying mass and exercising priestly functions in Williamsport, and that plaintiff be restored to his rights and emoluments as they existed and were enjoyed by him on the 5th of November 1871, and before the note of that date from the bishop was addressed to him.

"5. That the defendant be restrained from interfering with the exercise of his office of pastor of said church, except as provided by the laws of the Catholic Church."

The defendant answers:

"Admitting that plaintiff was regularly ordained priest by Right Rev. James F. Wood, Bishop of Philadelphia, and avers that the office was held by him, subject to the laws and rules of discipline of the Catholic Church; denies that he was charged with the duty of collecting a congregation, as that service was performed by the predecessor of the plaintiff, but admits that he procured means for the erection of a church building; that such church was erected, and plaintiff administered in the same, under the direction of his bishop; that the fee-simple title to the church property was in Bishop Wood, and was by him transferred to defendant after the erection of the Diocese of Scranton; denies that the plaintiff is entitled to remain, or still is the pastor of said church, but avers that plaintiff was appointed to said charge, and was, under the rules of discipline in force in the said church, liable to remain as such pastor or to be removed or transferred elsewhere by his bishop, and that as a voluntary member of said church all the rights of plaintiff to be and remain, and to perform the faculties of such pastor, are received from and held in subordination to his bishop, as shown by the declared will of said church.

"Admits that plaintiff has had an annual income derived from the renting of pews, but that such income was uncertain, both in nature and amount, and denies that he is entitled to a continuance of same.

"That the Diocese of Scranton embraces, inter alia, the county of Lycoming, in which is situated the Church of the Annunciation.

"Admits that he sent the plaintiff the letter of November 5th

1871, and that by that act he removed the plaintiff from his office; that the plaintiff acquiesced in the removal, delivered up possession of the property. and consummated the removal by reporting at Scranton, as directed; that defendant removed the plaintiff by full authority, vested in him and all bishops in the United States by the acts and decrees of said church, defined to be 'that power which the bishop has from the acknowledged discipline in these provinces (the United States) of depriving any priest of his charge or of transferring him to another;' that it is the duty of a bishop to assign priests to charges, and to remove or transfer them as he may judge is proper for the best interests of religion; that the plaintiff swore to serve the missions of this diocese under obedience to the bishop.

" Denies that it was his intention, either express or implied, to close the church against the congregation, and avers that neither the contributors, pew-holders or congregation, or any of them, are of parties to the bill or of interest in the cause.

"Avers that he is not informed, save by the bill, that the congregation are attached to the plaintiff or do not wish him removed; avers that neither the letter of removal nor the removal in fact was of the nature of ecclesiastical punishment or censure; that it was his intention to appoint the plaintiff to another charge, which he afterwards expressed to plaintiff, before service of process in this case, and denies that the law of the church required he should make any formal accusation or institute any trial or allege any fault on the part of plaintiff, and denies the removal was unwarranted by the law of the church or contrary to the law of the land, but avers it was an act of ecclesiastical discipline authorized by the law of the church, and not within the jurisdiction of civil anthority.

" Avers that obedience was due from the plaintiff, and that '*sub gravi*' was an ecclesiastical expression asserting the gravity of disobedience; denies that this prohibition is contrary to the laws of the church, but was dictated by conviction of episcopal duty.

"Avers that plaintiff had the right of appeal from any act of the bishop to the archbishop, from the archbishop to the primate, and from the primate to the patriarch, but the plaintiff has not sought within the church any correction of that wherein he feels himself aggrieved.

" That the questions raised are purely of an ecclesiastical character, and there is no jurisdiction in the civil courts over the person of defendant or the subject-matter.

" Prays to be dismissed with costs."

The other material facts were these: " There had been in Williamsport for some years quite a large Catholic congregation, composed both of Germans and English, that attended service in one church called the Church of St. Bonifacius. The English-speaking Catho-

lics increasing in numbers, Bishop Wood, in the year 1865, appointed the Rev. P. F. Sullivan in charge for the purpose of collecting a congregation of non-German Catholics. He remained in charge about a year. A lot for a church edifice was purchased, and a deed in fee-simple for the same to Bishop Wood, bearing date the 16th day of April 1866, was obtained and placed on record. The Rev. M. P. Stack was appointed by Bishop Wood to take charge of this congregation of non-German Catholics about September 1866, and remained in charge until the first part of November 1871, and during his ministry a church edifice was erected on the lot formerly purchased.

"The church was dedicated to worship in the year 1868. The Rev. Mr. Stack assisted, by obtaining contributions, in the erection of the church.

"The city of Williamsport remained in the Diocese of Philadelphia until 1868, when the Diocese of Scranton was established, and Williamsport was included within the limits of the new diocese.

"The Right Rev. William O'Hara became the bishop of this diocese in July 1868, with his residence at Scranton. Bishop Wood, by deed bearing date the 17th of September 1869, conveyed the title of the lot, on which the Church of the Annunciation was built, to Bishop O'Hara, the defendant in this case.

"On the 5th of November 1871, Bishop O'Hara wrote to the Rev. M. P. Stack the note set forth in the foregoing abstract of the bill.

"On the same day the bishop wrote a letter to the Rev. J. Kœper, the pastor of the Church of St. Bonifacius, in Williamsport, as follows:

"Rev. J. KŒPER.

"Rev. Dear Sir: I enclose you $600, which I wish you to pay to Mr. McCrystal, or his attorney, Mr. Norris. There is a sheriff's writ against the church of the Annunciation; it can be sold at any moment. Should this sum not be sufficient, pay the balance yourself, and then I will remit it to you. You will also take charge of all things connected with that church, such as vestments, furniture, books, &c., and keep them under your custody. They can remain in the house and church, but you will keep the keys. You may baptize and attend the sick, but nothing else.

"I am much pained to adopt this severe course, but the state of things in that congregation is such that I would consider myself wanting in duty to allow it to continue any longer,

"November 5.　　　　　　　　　"Yours in X,
　　　　　　　　　　　　　　　"W. O'HARA,
　　　　　　　　　　　　　　　"Bp. of Scranton."

Within a day or two after the date of the foregoing letters of the bishop, the Rev. Mr. Kœper called upon the Rev. Mr. Stack, and

[O'Hara *v.* Stack.]

showed him the letter he (Kœper) had received from the bishop. He received from Rev. Mr. Stack the registers of baptism and of marriage, and a sacred vessel of the church; he also obtained a set of keys of the Church of the Annunciation, which had been in the custody of the sexton. The Rev. Mr. Stack retained his set of keys.

On or about the 8th of November 1871, the plaintiff went to Scranton to see the bishop, and had an interview with him on that or the following day.

On the next day the Rev. Mr. Stack wrote from Scranton to the Rev. Mr. Kœper, as follows:

"Scranton, Luzerne Co., Pa., Nov. 9th 1871.

"Rev. J. Kœper.

"Dear Friend: Things have gone very well with me at headquarters. I have been treated kindly and considerately. The bishop says he will give me a mission of good income and free of debt. He thinks, very properly, that I do not relish the idea of paying off debts, or engaging myself with brick and mortar. He further suits my wish by affording a vacation of some ten days, at the expiration of which he will have prepared the mission desired, as above.

"He holds to his intention of punishing the Irish congregation of Williamsport; says he will not send a priest there for some time. On reflection, I think this course may prove beneficial. I intend going to Friendsville with Slattery, for Sunday, and preaching for the natives. I will be in Williamsport on Wednesday of next week, at furthest, and proceed at once to your residence.

"Until then and ever believe me yours truly,

"M. P. Stack."

On the week following his interview with the bishop, the Rev. Mr. Stack returned to Williamsport, and on or about the 26th of November he opened the church with the keys in his possession, and addressed the congregation, and stated his purpose of contesting the legality of the bishop's action.

On the 1st of December 1871, he filed the bill in this case. Eight members of the congregation and pew-holders therein joined in the bill, but upon their petition, and by leave of the court, withdrew as parties complainant, before answer was filed.

A large amount of testimony was taken before the examiner, upon the question of the law of the Catholic Church.

The case was referred to a master, Robert P. Allen, Esq., who, inter alia, reported:

"The complaint of the Rev. Mr. Stack is, that he was, contrary to the discipline of the Catholic Church, removed, by his bishop, from the charge of the congregation of the Church of the Annunciation, and that he was thereby deprived of an annual income

derived from the voluntary contributions and the renting of pews by the members. The plaintiff has not shown that he made an effort to obtain redress within the church.

"Had the plaintiff such a right of property in his salary as pastor, as to entitle him to claim the protection of a court of. equity, to reinstate him as pastor for the purpose of continuing the enjoyment by him of such salary? The plaintiff can claim no right of property in the church lot and building; the title to that is in the bishop, and the congregation are not alleging any violation of trust in the real estate on the part of the bishop. If the church had been endowed and had afforded a fixed annual income for the benefit of the pastor officiating in it, then the right of property claimed by the plaintiff would be obvious upon his showing his right to the office of pastor, but the amount which may be realized annually depends upon the will of others who may see fit to rent pews or make contributions. The position of pastor of this voluntary religious association is not a civil office created by the law of the land and governed by the law which created it, and the title to which the courts would determine as a right under the law.

"'Where an office is held during the pleasure of the appointing power, a removal may be either express, that is, by a notification that the officer is removed, or implied, by the appointment of another person to fill the same office. An office held during pleasure is not distinguishable from other cases of revocable authority.' * * * But when an officer holds for a specified term of years, 'if he shall so long behave himself well,' there is no implied conviction of misbehavior, nor any implied removal for that cause, arising from the appointment of another person to fill the same office:' Bowman v. Slifer, 1 Casey 29.

"Where an appointment is during pleasure, or the power of removal is entirely discretionary, there the will of the appointing or removing power is without control, and no reason can be asked for, nor is it necessary that any cause should be assigned: Full v. Commonwealth, 8 Casey 481; Ex parte Hennen, 13 Pet. 230. Where the power to remove is discretionary, no malice will be presumed in making a removal, and no damages can be recovered unless malice be shown: Burton v. Fulton, 13 Wright 151.

"The tenure of ministerial officers, under the laws of this state, is generally at pleasure: Field v. Directors of Girard College, 4 P. F. Smith 233; Reynolds v. Bussier, 5 S. & R. 460.

"The above cases show that the courts will not interfere, in cases of removals from civil offices, where the removing power is discretionary or where the tenure of office is at pleasure. In these civil offices the emoluments or salaries are provided either by legal fees or fixed salaries, and the courts must protect them in

[O'Hara *v.* Stack.]

the enjoyment of the rightful holders, the same as other rights of property.

" In the present case the salary which was received by the Rev. Mr. Stack, as pastor, was uncertain, and depended upon the voluntary contributions and voluntary renting of pews by the members of the congregation.    The plaintiff could not sue the congregation or any of its members for any salary ; the bishop placed him in charge of the congregation, and, under the discipline of the Catholic Church, the congregation had no choice in the selection of their pastor.

" Where the deed conveying the property and buildings of a church is silent as to the mode of electing a minister and his continuance in office, and makes no provisions for his salary or support, for which he is wholly dependent upon the voluntary contributions of the church members, a court of equity will not interfere to enjoin his removal by a vote of the church : High on Injunctions, sect. 236, quoting Porter *v.* Clark, 2 Sim. 520.

" Even granting that the right of the bishop, under the law of the church, to remove the plaintiff, as pastor of the congregation, in the manner in which the removal was made, was doubtful, but considering the tenure of the ecclesiastical office of priest in the Catholic Church in this country, and the great power, which it is admitted the bishops claim and have heretofore exercised over the priests, without any redress from the pope at Rome, who is the chief law-making power, and considering the fact that the exercise of this power by the bishops has been recognised by the decrees of the Catholic Church in the United States, in Plenary Council, first assembled in 1829, and last, as late as in 1866, and then considering that the right of property involved, in the removal of the plaintiff as pastor, is his right to receive an uncertain support, arising alone from voluntary contributions and renting of pews, the funds from which cannot be taken as equivalent to a benefice, or honorarium, or *bona ecclesiastica,* under the laws of the church, the conclusion is forced upon the mind of the master that there are no such rights of property involved in the questions raised by the bill and answer, as to justify a court of equity in granting a mandatory injunction to reinstate the Rev. M. P. Stack as pastor of the Church of the Annunciation, as he held the same on the 5th day of November 1871, and before he received the note of that date from the bishop.

" The want of jurisdiction- in a court of equity to grant the prayer of the plaintiff, is also shown by the fact, that the court would be powerless to give to the plaintiff the fruits of a decree in his favor.    The gravamen of the bill is the loss of the plaintiff's salary by reason of his removal, but if the court would reinstate him, he would not get any salary, unless the congregation saw fit to give it voluntarily, and they could not be compelled by decree to

[O'Hara v. Stack.]

make contributions or rent pews for the benefit of the pastor, especially in a church where the doctrine is inculcated that the superior can withdraw the faculties which a priest must receive from him for the proper care of souls."

The plaintiff excepted.

After argument, the evidence, master's report and the exceptions thereto were carefully examined and considered by the court below. As appears from the opinion delivered by the learned president judge of the court, the master's finding of facts and conclusions of law were corrected, and it was decreed:

1. That the removal by the defendant of the plaintiff as pastor of the Church of the Annunciation, in Williamsport, for an alleged offence, as ordered by the letter of the defendant to the plaintiff, dated the fifth day of November 1871, without regular accusation, hearing or trial, was unlawful.

2. That the prohibition and disfranchisement of the plaintiff by the defendant, as ordered in his letter to the plaintiff, dated the fifth day of November 1871, forbidding the plaintiff to exercise any priestly function in Williamsport, founded upon, and as punishment for said alleged offence, was unlawful. .

3. That the exceptions by the plaintiff to the report of the master are sustained, so far as they are consistent with this decree, and so far as they are inconsistent therewith, they are overruled.

And that the defendant pay costs.   From this decree the bishop appealed.

*J. O. Parker*, *A. Sydney Biddle* and *George W. Biddle*, for appellant.—The court had no jurisdiction of the case. The subject-matter of the jurisdiction of courts of chancery is civil property, and it is apparent that the act complained of infringed no civil right of property in the plaintiff.   Courts of chancery in this state have never assumed jurisdiction over even unincorporated societies formed for social or beneficial purposes merely, unless there be a clear civil right of property in question, and voluntary societies for religious purposes have even a higher immunity.   Our constitutional protection to liberty of conscience and freedom of religious worship, establishes a broad distinction between religious and other voluntary societies.   To many religious bodies, their forms of church government are nearly, or quite as essential as their principles of religious belief, and they are protected by the constitution.   The income of a priest, being derived from the renting of pews, &c., is too uncertain and fluctuating, and is not a sufficient right of property.   In this country the priest is ordained by the title of mission.   The mission is synonymous with diocese, and this title of ordination, therefore, establishes a mutual obligation between the priest and the diocese (to serve the

missions of which he is ordained), the one to serve and the other to furnish a living. Therefore, the plaintiff looked to the diocese of Scranton for his living, and his bishop was under moral obligation to furnish him such living within that diocese, by assigning him to such special charge therein as might seem fitting to him— the bishop. Had the plaintiff a right to a fixed salary, the infringement of even such a right could not be corrected in a court of chancery: Chase *v.* Cheney, 10 Am. Law Reg. (N. S.) 302; Bouldin *v.* Alexander, 15 Wall. 139.

The want of jurisdiction is manifest, too, from the fact that this court would be powerless to give the plaintiff the fruits of a decree in his favor. Even if reinstated, no court could compel a single Catholic to attend or contribute to the church where plaintiff officiated. If aggrieved by the act of his bishop, the plaintiff has an adequate remedy at law. Therefore, the only additional remedy for which the plaintiff could ask, would be an order of this court to reclothe the plaintiff with all his priestly faculties, and to place him *in statu quo* he stood before he received the letter of removal. It would be idle to claim that this court had any such power. The most they could do would be to place him in position to receive the voluntary perquisites and offerings of such of his former people as chose to contribute, and if wronged by the loss of those uncertain revenues, an action at law would afford an adequate and ample remedy: Bouldin *v.* Alexander, 15 Wall. 139; Garten *v.* Penick, Am. Law Reg., May 1871, p. 305; Clark *v.* Evangelical Society, 12 Gray (Mass.) 17. The defendant holds title under no express trust, and none of those who contributed to the erection of the church, or who are pew-holders therein, are parties to this bill. See Leslie *v.* Burne, 2 Russ. 119; Porter *v.* Clark, 2 Simons 520. If injured, the plaintiff should first exhaust his remedies within the church: German Reformed Church *v.* Seibert, 3 Barr 282; Henderson *v.* Hunter, 9 P. F. Smith 343.

The bishop had a right, according to the law of the church, to remove the plaintiff. Removal is not like suspension. Suspension implies punishment. Removal inflicts no punishment, implies no fault. Its only effect is to prohibit the exercise of priestly faculties in the place from which the priest is removed. His faculties remain for full and free exercise in any other place in the Sacred Mission, or diocese, to which his bishop may assign him. Throughout these United States, where the church is on a missionary basis, the bishop of each diocese has supreme control of every separate charge or congregation therein. The congregations themselves have no voice in the selection of priest or pastor. The bishop, and he alone, selects and assigns to each that pastor who is, in his judgment, best fitted for the charge. And this appointment is *ad libitum*, not for life, or years, or during good behavior. This absolute power of appointment carries with it, as a necessary incident.

[O'Hara v. Stack.]

absolute power of removal of the priest, and this right in the bishop is distinctly recognised again and again in the general legislation of the church and in positive terms conceded to the bishops in this country by decrees of the councils who have legislated for the American branch of the Catholic Church. It is a right reposed in the sound discretion of the bishops, to be exercised as they think fitting in the Lord for the best government and interests of their whole charge: Pastoral of the Prelates of the Baltimore Council of 1866 ; Constitutions of the Second Synod of Philadelphia; Remick Theologia Moralis, p. 34. The removal was not contrary to the law of the land. On entering the church, the plaintiff voluntarily subjected himself to her discipline and held his rights subject to her law.

W. S. Price and William H. Armstrong, for appellee.—The letter of the bishop to the plaintiff was at once an accusation, sentence and infliction of punishment. A grave crime or offence on the part of Father Stack is officially assumed, and the penalties inflicted are removal, which involves deprivation of his living and a prohibition sub gravi. These are recognised ecclesiastical punishments ; and inevitably attendant upon such a procedure is the irreparable injury to the reputation of the priest and his future usefulness in the church. These proceedings are contrary to the law of the Roman Catholic Church. By it a superior can only proceed against his subordinate after inquiry and trial: Corp. Jur. Can., lib. V., tit. 1, de Accusationibus ; Conc. Tridentenum (Leip. ed.) 254; Pontif. Rom., part 1, p. 88; Plenary Council of Baltimore, sects. 76, 77; Smith's Elements of Eccl. Law 381. Even if the action of the bishop was in accord with the law of the church, it would be contrary to the law of the land. No man shall be condemned without a hearing, is a maxim of fundamental law : In re Brook, 111 E. C. L. R. 416; Field v. Commonwealth, 8 Casey 478 ; Kerr's Appeal, 8 Norris 97.

An individual does not part with his personal rights or rights of property by becoming a priest in the Roman Catholic Church, and what is submitted in the argument for the appellant, about Father Stack being a voluntary member of the church, does not go to the point of the controversy. The laws of the church bind the bishop equally with the priest, and they are valid only so far as they are not contrary to the law of the land. If any corporation were to enact a by-law, or any voluntary association were to establish a rule or law, which should, as between officers or members of the body, constitute one a judge in his own complaint, and profess to authorize him summarily to condemn the person complained of, in his absence, without a hearing, and then, by way of sentence or punishment, expel him, can there be any doubt that such by-law, rule or law would be held to be absolutely void ?

[O'Hara *v.* Stack.]

To the appellant's suggestion, that the right of a bishop to appoint priests to churches necessarily implies that he has the power to remove them at pleasure, we reply that the power of appointment and the power to remove a priest are distinct powers. The cardinals choose the pope, but can they remove him ? By the common law, as long ago as Brogy's Case, 11 Coke 99 a, it was determined that the power of amotion did not pass by a grant to elect, as an incident to it. The courts of Pennsylvania have authority to redress any wrong committed within its limits by any body of men, except only the legislature of the state: Kerr *v.* Trego, 11 Wright 292. The plaintiff has personal rights pertaining to his office as pastor of this church. The mere uncertainty of .the amount will not leave him without remedy : Fry *v.* Jones, 2 Rawle 11. He has likewise a property in his profession, which the law will recognise : Burns's Adm'r *v.* Steward's Adm'rs, 3 Dessaus. 478 ; Ex parte Garland, 4 Wall. 333 ; Cummings *v.* Missouri, Id. 278.

When the charter of a society, or the law or discipline of an unincorporated association, provides for an offence, directs the mode of proceeding and on conviction of a member authorizes his punishment by expulsion, if the proceedings are not irregular the expulsion is conclusive ; but if the proceedings are found by the court to be irregular, the expulsion will be declared void. "The courts have jurisdiction to keep such tribunals in the line of order and to prevent abuses." And the regularity of the proceedings must be affirmatively shown by the officials who are called upon to justify what they have done : Commonwealth ex rel. Bryan *v.* Pike Beneficial Society, 8 W. & S. 247 ; Washington Beneficial Society *v.* Bacher, 8 Harris 425 ; Commonwealth ex rel. Fischer *v.* German Society, 3 Id. 251 ; Evans *v.* Philadelphia Club, 14 Wright 107 ; Green *v.* African Methodist Society, 1 S. & R. 254 ; Kisor's Appeal, 12 P. F. Smith 428 ; Kerr's Appeal, *supra.* There could be no appeal from the bishop in this case, because there would be no record to review. There was no form of judicature observed. Mere priests have no right of direct recourse to the pope : Bouv. Inst. Theology, vol. 1, pp. 446–7. If they have any recourse, it is only *ex gratia.*

The acquiescence by the plaintiff in an illegal act of the defendant would not legalize it : Bishop of Natal, 3 Moore's Privy Council Cases, N. S. 115.

Mr. Justice MERCUR delivered the opinion of the court, October 6th 1879.

This bill was filed by the pastor and eight members of the congregation and pewholders of the Church of the Annunciation, in Williamsport. It prayed substantially that the bishop be restrained by injunction from removing or attempting to remove the appellee as pastor of said church, and also against prohibiting him from exer-

[O'Hara *v.* Stack.]

cising priestly functions in Williamsport; and further asked, that he be restored to his rights and emoluments as they had previously existed and been enjoyed by him. Upon their own petition, and by leave of the court, all the complainants, except the appellee, withdrew before answer was filed. When the learned judge came to enter a decree he found the relations and attachments of the congregation towards the appellee had so changed, and the wise and prudent conduct of its present pastor had so secured its confidence and regard, that he thought it unwise to disturb the existing relations. He therefore refused restoration. He decreed that the removal of the appellee as pastor of the church, and also the prohibition and disfranchisement, forbidding him to exercise any priestly functions in Williamsport, were unlawful; yet, in a spirit of conciliation and compromise, he restricted the liability of the bishop to pay costs, so far as to exempt him from the payment of any bill of the appellee. From that decree, thus imposing a part of the costs on him, the bishop has taken this appeal.

The practical question before us is so narrow, that we deem it unnecessary to discuss the numerous matters involved in the bill and answer. The single question we will consider is whether the appellant has just ground to complain of the decree. The rules and discipline of the church, the cause of religion and the good order of society, justly authorize the bishop to remove a priest from his charge for cause, and to transfer him from one parish to another, as he may deem proper. In this case the appellee was not transferred to another parish. Whether without any specific accusation against a pastor, and without giving him any opportunity for hearing or trial, the bishop can remove him from his charge, without assigning him to any other, and prohibit him from exercising all priestly functions, present grave questions. The appellee is a regularly ordained priest of the Roman Catholic Church. In 1866 he was duly appointed, by the bishop of the diocese, to the charge of this congregation of non-German Catholics. He continued its pastor until the 5th November 1871. By letter of that date, Bishop O'Hara, the appellant, wrote the appellee, saying:

"Rev. Sir: Your administration of the affairs connected with the Church of the Annunciation has been such that I feel myself compelled to remove you, and leave the church vacant. And I now forbid you to exercise any priestly functions in Williamsport, even to say mass. This prohibition binds *sub gravi.* You may call on me at Scranton, and I will inform you of my further intention in your regard."

On the same day, the bishop also wrote to the Rev. J. Kœper, pastor of the Church of St. Bonifacius, in Williamsport, informing him that the sheriff had an execution against the Church of the Annunciation, so that it was liable to be sold, and enclosed him money to pay the execution. He further proceeded to say: "You

will also take charge of all things connected with that church, such as vestments, furniture, books, &c., and keep them under your custody. They can remain in the house and church, but you will keep the key. You may baptize and attend the sick, but nothing else. I am much pained to adopt this severe course, but the state of things in that congregation is such that I would consider myself wanting in duty to allow it to continue any longer."

In pursuance of this direction, Mr. Kœper took possession of the registers of baptism and of marriage and a sacred vessel of the church, and also of the set of keys that were in the possession of the sexton, but not of the set of keys in the possession of the appellee. Afterwards, the latter opened the church, addressed the congregation and stated his purpose to contest the legality of the bishop's action. About one week thereafter he filed this bill.

The letter of the 5th November complains in general terms of his administration of affairs connected with the church, but charges no specific act, either of omission or of commission, showing in what particular it was not satisfactory. He is not informed whether the complaint refers to spiritual or to temporal affairs. It gives no information sufficient to enable him to answer and refute the complaint. It neither gives, nor indicates any intention of giving, him permission to inquire the reasons for his summary removal. At one and the same moment a vague charge is made, the edict issued and the sentence pronounced. The answer of the appellant avers no specific cause for the removal, and the evidence fails to disclose any.

In pursuance of the bishop's permission to call on him at Scranton, the appellee did so. The uncontradicted testimony of the latter in regard to that interview is: "I saw Bishop O'Hara in his residence on or about the 9th November 1871, but he neither made definite his charge nor gave any trial, nor revoked his letter, but wished me to resign my parish at Williamsport, making vague promises and stating general conditions of a better one if I would resign."

It is a maxim of fundamental law that no man shall be condemned without a hearing. A hearing assumes notice of the specific grounds of complaint, and a reasonable opportunity for answering them. In all matters of faith and of doctrine churches are left to speak for themselves. When rights of property are in question, civil courts will inquire whether the organic rules and forms of proceeding prescribed by the ecclesiastical body have been followed: Nopp et al. *v.* St. Mark's Lutheran Church of Butler, not yet reported; Kerr's Appeal, 8 Norris; and if followed whether they are in conflict with the law of the land. Any rule or proceeding whereby a man's property is swept away from him without a hearing, trial or judgment, or the opportunity of making known his rights therein, is not according to the law of the land

[O'Hara v. Stack.]

within the meaning of the 9th sect. of the Declaration of Rights: Brown v. Hummel, 6 Barr 86; McAuley's Appeal, 27 P. F. Smith 397.

Had the appellee such a right of property in the revenues of his church and in his profession as to authorize a court of equity to inquire into the matter of his removal? He had no specific salary. His income was derived from rent of the pews, Sunday collections, subscriptions and offerings. The Roman Catholic Church makes the support of its pastors one of the commandments of the church. Its precept requires the members of the congregation to contribute to the support of their pastor. It is declared to be a sin of omission, to omit anything willingly, which is commanded by God or *his church*. While the precise sum the appellee might receive, could not be ascertained in advance; yet the sum of which he was in the actual receipt was so large, that it is not alleged to have been inadequate to his proper support. A man's profession is his property. The appellee was not only deprived of his right of property as pastor of that particular church; but he was also prohibited from exercising any priestly functions, as a means of support, elsewhere. The literal reading of the order forbade the exercise of such functions in Williamsport. Inasmuch, however, as he had been assigned to no other parish, the effect was, to close the doors of every parish against him. The strong arm of the church was laid upon him. All means of support were denied to him, and a stigma was cast on his reputation. The *sub gravi* of the prohibition was a reminder that his administration was of so grave a character, that any disobedience to the order of prohibition, would be a grievous sin. The harshness of the bishop's conduct was well designated in his letter to Mr. Koeper, as "this severe course."

The Act of 16th June 1837, and its supplement of the 14th February 1857, expressly give Courts of Common Pleas of the several counties of the Commonwealth, the supervision and control of unincorporated societies or associations. In granting injunctions, not only acts contrary to law, may be enjoined, but also those contrary to equity: Stockdale v. Ullery, 1 Wright 486.

Then, without reviewing the conflicting opinions as to the ecclesiastical power given to the bishop to deny to a priest the exercise of all priestly functions, without assigning any cause, we cannot assent to the doctrine that the pastor's right of property may thus be stricken down, and he be prohibited from following his profession, without accusation, and opportunity for a hearing and trial. If it is not contrary to the laws of the church, which we are not prepared to admit, it is contrary to the supreme law of the land. The appellant has no just cause to complain of the decree.

Decree affirmed, and appeal dismissed at the costs of the appellant.

[O'Hara *v.* Stack.]

Mr. Justice TRUNKEY filed a dissenting opinion, in which Mr. Justice STERRETT concurred.

A motion was subsequently made for a re-argument, which was refused, Chief Justice SHARSWOOD, on the 19th of January 1880, delivering the following opinion:

The motion for re-argument is refused. I desire to add for myself that I think that the learned counsel of the appellant have misapprehended the opinion and decision in the case. I did not and do not understand that it settled anything as to the powers and rights of the bishops of the Roman Catholic Church over the priests. The only decree of the court below adverse to the appellant was that upon the subject of costs. In courts of equity costs are in the sound discretion of the chancellor. They do not necessarily fall on the losing party as they do at law. It appeared to me that whether the appellant had or had not the power which he assumed and exercised over the appellee, that in reason and good conscience he was bound to make known to him the ground of his proceeding, that neither he nor the church might be left to conjecture that it was conduct which affected his character as a clergyman. In concurring in the decree of affirmance, all that I meant to decide and all I think that was meant to be decided was that under the special circumstances of the case, the judge below exercised a sound discretion when he refused to impose all the costs upon the appellee.

                                        Motion refused.