Trustees of St. George's Lith. Roman Catholic Ch.
of Shenandoah *v.* Karalus, Appellant.

Argued December 7, 1931.

Before Trexler, P. J., Keller, Linn, Gawthrop, Cunningham, Baldrige and Stadtfeld, JJ.

*Daniel C. Donoghue,* and with him *John J. Moran, M. A. Kilker, John F. Whalen,* for appellant.

*Roscoe R. Koch,* and with him *Edgar Downey, Otto E. Farquhar,* for appellee.

Opinion by Cunningham, J., March 5, 1932:

The controlling question presented by this appeal is whether a canon of the Roman Catholic Church to the effect that the priest of the parish has authority

to determine what societies may meet in the church building and to announce and conduct the meetings of purely religious societies therein, without notice to or obtaining consent from the lay trustees of the church property and without paying any rental for the use thereof by such societies, is in conflict with the law of the land.

The plaintiffs are the lay trustees of St. George's Lithuanian Roman Catholic Church of Shenandoah and the defendant, Reverend Joseph Karalus, is the parish priest. Early in 1930 unfortunate differences arose between the trustees and the pastor, particularly with respect to the use of the basement of the church building. Proceedings in equity were instituted in the court below which resulted in the entering, by agreement of counsel, of the following decree:

"And now, June 26, 1930, after hearing the counsel representing the parties in this case, it is ordered, adjudged and decreed that a writ of injunction be issued perpetually restraining the Rev. Joseph Karalus from interfering with or preventing the congregation and the plaintiffs, as trustees, from holding their meetings in the basement of the church edifice, and from denying them the lawful use and enjoyment thereof, and that he further be restrained perpetually from excluding the plaintiffs from possession and control over the church property, and from interfering with and hindering them in the care, maintenance and management thereof, and from preventing them caring for, maintaining and managing the same.

"It is further ordered, adjudged and decreed that both the trustees and the priest shall have a key for access to the rooms in the basement and that only organizations of the church shall hold meetings in the church property, but such meetings shall be held at such times as not to interfere with the religious exercises that are necessary and proper in the church. It

is further ordered, adjudged and decreed that the defendant pay the costs."

No exception was taken to the entering of this decree and its merits are not here involved.

By reason of certain contentions which arose primarily out of the interpretation of the decree and culminated in unseemly disturbances at the church building on July 27 and August 10, 1930, the trustees presented their petition to the court below for an attachment against the pastor for an alleged contempt on his part "in failing and refusing to obey" the injunction. A rule was granted, the answer of the pastor filed, and the matter came on for hearing on October 31, 1930; the result of this proceeding was a finding by the chancellor on January 5, 1931, that the pastor had "interfered with and hindered" the trustees in the management of the church property when, on the dates stated, he gave certain religious societies access to the basement of the church without the payment of rental and against the protest of the trustees. The chancellor further found that the pastor acted "under the sincere belief that, as pastor of the parish, he had a lawful right" so to do and therefore imposed no fine but directed him to pay the costs and expressed the hope that the parties would take "a broader view of their duties and perform them in a true christian spirit rather than by exercising a too meticulous regard for their respective rights." From the final order adjudicating that the pastor had disobeyed the injunction and imposing the costs of the proceeding upon him as punishment we now have his appeal.

There was a sharp conflict in the testimony relative to the extent of the participation of the respective parties in the disturbances of July 27th and August 10th, and with respect to the responsibility therefor, but the controlling facts to which the law must be applied in this case are not in dispute and the testimony indicates that the disorders were due to some

extent to the fact that the trustees had not up to that time complied with the provision in the decree that the priest, as well as themselves, should have a key for access to the rooms in the basement. From the pleadings and the chancellor's findings of fact we gather that the church is an unincorporated religious association, having a board of five lay trustees to care for, maintain and manage its property. These trustees claimed the right to charge a rental for the use of the basement of the church and to be advised in advance of the holding of any meeting therein "irrespective of the purpose or purposes for which, or by whom, any meeting or meetings are to be held." For many years prior to the filing of the bill for an injunction, two general classes of societies had been holding meetings in the basement: (1) secular organizations and (2) purely religious societies. The secular organizations were of two classes: (a) certain mine locals and the general mine board and (b) several beneficial associations, the members of which were also members of the congregation, viz., the Societies of St. Stanislaus, St. George's and Ansrobromo; all of these secular societies met on week-day evenings and paid a rental to the trustees for the use of the church basement.

By reason of the provision of the decree of June 26th "that only organizations of the church shall hold meetings in the church property," the meetings of the mine locals and of the general mine board were discontinued. There are four purely religious societies in the congregation, composed largely of women members, namely, The Tratinikiui Society of Third Order of St. Francis; Apostleship of Prayer; Rosary Society, and Sodality of the Blessed Virgin Mary. These societies are approved and sponsored by the church authorities, use a prescribed manual and meet for the purpose of conducting religious services in accordance with the faith, discipline and canons of the Roman Catholic Church. The meetings of three of them are

held upon stated Sundays each month and the fourth meets on the first Monday of each month. They have been conducted in the basement of the church for a long time and none of them has ever paid any rental for its use. They have no treasuries, but voluntary contributions are sometimes made at the request of the spiritual director for the relief of needy members and for the supplying of decorations for the altar.

The matter in controversy is the right of the pastor to announce, during the church services, the meetings of these societies and to conduct or have them conducted in the basement without first obtaining the consent of the lay trustees and without the payment of rental. The contention of the pastor is that the church law gives him authority to determine what religious meetings shall be held, and when and where, and that the trustees may not exact fees for the use, for religious purposes, of any part of the church property.

Three of the findings of fact of the chancellor read: "12. Under the laws of the Catholic Church the pastor has the right to say what societies may meet in the basement of the church. 13. And under the said laws no rent may be charged for meetings of purely religious societies in the basement of the church. 14. The Tratinikiui and the Apostleship of Prayer Societies are recognized as religious societies under the canon law of the Catholic Church." In his sixth finding the chancellor found that the Rosary Society and Sodality of the Blessed Virgin Mary were also purely religious societies. On Sunday, July 27th, a meeting of the Tratinikiui Society was announced and held in the basement notwithstanding the objection and protest of the trustees and on Sunday, August 10th, a meeting of the Rosary Society was announced and held under similar circumstances. The question, therefore, was whether the pastor by announcing and insisting upon holding these meetings, against the active pro-

test of the trustees and without arranging for the payment to them of rental, violated the injunction then in force. The learned chancellor, citing the seventh section of the Act of April 26, 1855, P. L. 328, as amended, and Ryan v. Dunzilla, 239 Pa. 486, held that he did.

We are not convinced that the proper application of the law to the facts in this case results in the conclusion that the pastor violated the injunction. It may be observed that the decree of June 26th clearly recognized that the property was to be used primarily for religious exercises and that the meetings of secular organizations were to be held at such times as would not interfere with them. The pastor was specifically enjoined from interfering with or preventing the congregation, or the trustees, from holding their meetings in the basement of the church edifice and from denying them the lawful use and enjoyment thereof. There was no evidence that he had interfered in any way with any meetings of the congregation or of the trustees. The adjudication against him was upon the ground that his insistence upon holding religious meetings in the basement in defiance of the trustees' objection and without complying with their demand for the payment of rental amounted to an interference with them in the "care, maintenance and management" of the property.

The dispute here seems to relate to the use which may properly be made of the church basement, rather than to the "control and disposition" of the church property as those words are used in the statute. The applicable portion of the seventh section of the Act of April 26, 1855, P. L. 328, as now amended by the Act of May 20, 1913, P. L. 242, reads: "Whensoever any property, real or personal, other than funds from plate, Christmas, and Easter collections, and annual voluntary contributions for salaries of clergy, teachers, organist and sexton, shall hereafter be bequeathed,

devised, or conveyed to any ecclesiastical corporation, bishop, ecclesiastic, or other person, for the use of any church, congregation, or religious society, for religious worship or sepulture, or the maintenance of either, the same shall be taken and held subject to the control and disposition of the lay members of such church, congregation, or religious society, or the control and disposition of such constituted officers or representatives thereof, as shall be composed of a majority of lay members, citizens of Pennsylvania, having a controlling power according to the rules, regulations, usages or corporate requirements thereof, so far as consistent herewith, which control and disposition shall be exercised in accordance with and subject to the rules and regulations, usages, canons, discipline and requirements of the religious body or organization to which such church, congregation, or religious society shall belong.''

Church property constitutes a trust; this property was dedicated to the maintenance of ''religious worship'' in accordance with the faith and discipline of the Roman Catholic Church and the basement is a part of the property so dedicated: Craig v. First Presbyterian Church of Pittsburgh, 88 Pa. 42. The rules, regulations, usages, canons, discipline and requirements of the religious organization to which the church belongs are paramount except where they conflict with the law of the land. The principle was thus stated by Mr. Justice BROWN in Ryan v. Dunzilla, supra: ''But when rights of property are in question, the civil courts will inquire whether the organic rules and forms of proceeding prescribed by the ecclesiastical body have been followed; and, if followed, whether they are in conflict with the law of the land: O'Hara v. Stack, 90 Pa. 477. So far as the canons of the church are in conflict with the law of the land, they must yield to the latter; but, when they do not so conflict, they must prevail.'' The case of Ryan v. Dunzilla grew

out of a previous controversy between a former pastor of this church and its then lay trustees with respect to the division, as between the trustees and the pastor, of certain revenue derived from the sale of burial lots and from the management of the church property. The chancellor, in his discussion of the present case, cited and relied upon that one as authority for his conclusion that the plaintiffs have the right to charge rentals for the use of the basement "by societies composed only of members of the congregation" and quoted the following from the opinion: "Rentals for the use of the rooms in the basement of the church wherein societies composed only of members of the congregation meet [are to] be paid to the treasurer of the congregation of the church."

That case does not, in our opinion, warrant the application made of it to the case at bar. The controversy there grew out of the fact that the trustees, contrary to the wishes of the pastor, had undertaken to impose a "portal collection" of ten cents made at the door of the church from practically all male members of the congregation. Other sources of revenue consisted of annual dues paid by each male member, plate collections taken inside of the church, moneys received for cemetery lots and burial permits and rentals for the use of the rooms in the basement "wherein societies composed only of members of the congregation meet;" all of these revenues were placed in the treasury of the church and disbursed upon orders signed by the rector and two officers or by three officers of the congregation. Under the canons of the denomination the portal collection could not be imposed without the consent of the pastor and he had the sole and exclusive right to determine who should be buried in the cemetery belonging to the congregation. The conclusion of our Supreme Court was that the legislation referred to had placed in the lay members of the congregation the ownership of the church property, which

necessarily carries with it "the right to receive and control, for church purposes, the revenues derived from the church properties." It was further held that the other revenues involved in the case were paid by the members of the congregation for pious uses and were therefore to be turned over to the priest "for the law of the church gives him control of them, and no law of the land takes it from him." The decree was modified to provide that the trustees should be perpetually restrained from taking up the collection at the portals of the church and from interfering with the priest in issuing burial permits and to provide that the moneys arising from the sale of lots and for the purchase of permits, "together with the rentals for the use of the rooms in the basement of the church wherein societies composed only of members of the congregation meet," be paid to the treasurer of the congregation. It is clear to us that the "societies" from which the trustees were authorized to collect rent were secular societies, similar to the beneficial societies referred to in the testimony and findings in the present case, and not purely religious societies. The principles applicable in disposing of this case are also considered in Zernosky v. Kluchinsky, 278 Pa. 99, and Maceirinas v. Chesna, 299 Pa. 70.

Our conclusion is that appellant, in insisting upon his right as pastor to hold meetings of the specified religious societies in the basement of the church, without first obtaining permission of the lay trustees and without paying any rental, was acting in accordance with the usages, canons and discipline of the religious organization to which the church belongs, and that such usages and canons are not in conflict with the law of this state. We are also of opinion that such acts did not amount to an interference with or hindrance of the trustees in the performance of their duties in "caring for, maintaining and managing" the church property, or warrant the conclusion that the pastor

had disobeyed the injunction. It follows that the first, fourth and fifth assignments must be sustained and the decree appealed from reversed.

The decree of January 5, 1931, is reversed and the rule to show cause why a writ of attachment should not issue discharged at the costs of appellees.