# Sherry v. Cedarbrook Country Club (No. 2)

*James F. Masterson, Fred DiBona* and *Thomas Masterson,* for plaintiffs.

*Dechert, Price & Rhoads,* for respondents.

*Thomas J. McCormack* and *Michael Shekmar,* for intervenors.

ALESSANDRONI, P. J., and REIMEL, J., December 10, 1962.—While the proceedings in equity have been finally resolved and our adjudication has been filed, the master, as well as counsel for plaintiffs, counsel for the active members of the club, and counsel for nonmember certificate holders, have filed petitions for allowance of counsel fees and costs.

A hearing was held before President Judge Eugene V. Alessandroni and Judge Theodore L. Reimel (Judge Leo Weinrott did not participate) at which testimony was offered by plaintiffs' counsel in support of their petition. Following the hearing, the court heard arguments submitted by the other petitioners and counsel for the Cedarbrook Country Club.

It is necessary to consider the history of this protracted and difficult litigation in order to indicate the

roles played by the various parties now petitioning for the payment of their counsel fees and costs.

Cedarbrook Country Club is a nonprofit corporation organized and existing under the laws of Pennsylvania for the purpose of the "maintenance of a club for the encouragement of golf and other athletic sports", and to exist perpetually. Its charter was granted by the Court of Common Pleas Number 3 on February 23, 1915, and the club has at all times been maintained for its chartered purposes. The club was limited to 425 members, of whom, at the commencement of the original suit, 103 were proprietary members and 193 active members. There were, in addition, a number of women and junior members who had no voting rights.

In 1958, the club accepted a substantial offer to sell the golf course and club house, and the officers of the club, pursuant to authority given them by its Board of Governors, entered into an option agreement for the purchase of land in Montgomery County, Pennsylvania. Acquisition of this option was authorized by a meeting of the proprietary members held September 3, 1958. Authority to complete the purchase was sought from the proprietary members at a meeting held July 13, 1959. There were various contentions about what happened at this meeting. The result was that two days later, on July 15, 1959, the original suit in equity was commenced.

The action in equity was instituted by five proprietary members who were later joined by approximately 32 additional proprietary members, all represented by petitioners in the instant suit, James F. Masterson, G. Fred DiBona and Thomas A. Masterson, Esquires. The complaint alleged that resolution adopted at the special meeting of the defendant club on September 3, 1958 to sell the club property and to relocate was adopted as a result of misrepresentations of fact and

misrepresentations of law; that the resolution to exercise an option to purchase ground for relocation adopted at the meeting held July 13, 1959 was illegal; and that the officers and directors of the defendant club sold proprietary membership certificates to persons who favored adopting the resolution to exercise the option.

Plaintiffs requested an injunction against defendants prohibiting offering, transferring, issuing, selling or reissuing proprietary membership certificates pending determination of the legal questions involved; prohibiting exercising the option to purchase land for relocation; and prohibiting holding any further meetings or taking any further action in regard to relocation. If all the relief sought were granted, it would have enabled the members, with full knowledge of their rights and with full knowledge of the law affecting these rights, to determine fairly, impartially, and wisely whether to sell or not to sell, to relocate or not to relocate, to dissolve or continue. The club was about to commit its entire resources, over $2,000,000, on a resolution which had been passed under circumstances which would render the club subject to many legal dangers. As a result of the diligent prosecution of the action by plaintiffs, through their counsel, the action was brought to a conclusion beneficial to the club, and to all its members.

Five persons who were active members of the club filed a petition to intervene as a committee representing active members in order to prevent a dissolution of the club. They were represented by petitioners, Thomas J. McCormack and Michael Shekmar, Esquire. The intervention was permitted by the court.

During the course of this action, an order was entered requiring all owners of proprietary certificates of the club who were no longer active members to present formally their objections to a plan developed by

plaintiffs and defendants for the settlement of the litigation between them. This order resulted in the joinder of the nonmember certificate holders as respondent parties. Two of these nonmember certificate holders are represented by petitioners, Dechert, Price and Rhoads, Esquires.

In addition to respondents, there were approximately 197 other owners of proprietary certificates who were not current members of Cedarbrook Country Club. It was apparent that the seemingly prohibitive expense of litigation for any individual under the circumstances kept all but a very few of these nonmember owners from appearing by counsel to express their views in regard to the plan of settlement, and, the petitioners in effect protected their interests in representing the respondents.

In view of the necessity of an early determination of the issues in this case, and necessarily by agreement of the parties since masters are no longer appointed by the chancellor, the court appointed Samuel Weinrott, Esquire, as special master, for the purposes of conducting immediate hearings, taking testimony, holding informal meetings with dissident groups and reporting promptly to the court thereon. The master could be appointed only as a result of the agreement and cooperation of all the counsel involved. In fact, after preliminary negotiations, all the counsel, the master, and the court were in agreement that the purpose of the negotiations should be to preserve the club and remove all of the problems and conditions that had plagued the club for so many years.

After much diligent labor on the part of the master and all the counsel, and as a direct result of the wholehearted efforts of these counsel to cooperate with the master and the court to achieve a satisfactory solution to the many problems, a plan of settlement was agreed upon. The plan provided that the club would pay to

nonmember certificate holders the face value of their respective certificates, $1,000, less any indebtedness of the registered holder to the club, and further provided that proprietary members would be entitled to receive $3,000 each for the surrender of their certificates and rights thereunder, less their respective unpaid indebtedness to the club, and subject to certain other deductions in some cases and to certain differences in time of payment. Thus the proprietary members were eliminated as a class of ownership, and the ownership of the property and the entire operation of the club was vested in one class of members, all obligated to pay dues and hence to maintain an interest in the club.

The threat of future litigation involving the legality of the resolutions of September 3, 1958, and July 13, 1959, was removed, and the club was thereby allowed to expend the fruits of the sale in the acquisition of new facilities without fear of further litigation.

Immediately upon the completion of the plan of settlement, all counsel and the master cooperated with the club's management in obtaining the approval of the proprietary membership, the general membership, and, ultimately, this court. Indicative of the great degree of cooperation required and actually present in the settlement of these problems, and also the fairness of the settlement eventually achieved by the master and counsel, the plan was adopted unanimously by both the proprietary members as a class and by the active members as a class and then by the combined vote of both classes.

In obtaining approval of the court, petitioners joined with the master in many hours of fruitful labor, preparing findings of fact and conclusions of law in the nature of a rule to show cause why all persons holding Cedarbrook Country Club Proprietary Membership Certificates should not be joined as parties in this action and why they should not be permanently barred from asserting any claim in excess of the amount pro-

vided for them in the plan for settlement of litigation. The petitioners suggested this method as a means of bringing into court all of those persons whose interest would be affected by the plan, thereby affording them a forum to voice their objections, and ensuring that the litigation would be brought to a final termination.

Attacks were made against the plan by numerous persons, including appeals to the Supreme and the Superior Courts. There were countless hearings and meetings held in connection therewith. All the petitioners participated in them and they eventually defeated the attacks on the plan by the dissident groups. The club has now relocated at another site and has constructed a new golf course, a club house, and other necessary facilities, and has retired all of the certificates of the proprietary members.

The plaintiffs contend that the suit originally instituted by them was a shareholder's derivative suit and that all costs and attorney's fees connected with this suit should be borne by the club.

Defendant, Cedarbrook Country Club, does not dispute the tremendous amount of time and effort given by all petitioners to this protracted and difficult litigation. It contends that the original suit instituted by plaintiffs was a suit in the nature of an adversary proceeding, that the suit was unsuccessful in that plaintiffs did not obtain all that they desired, and that all costs and counsel fees should be imposed upon the plaintiffs since they were the losing party in an adversary proceeding. Defendant joined with all other parties in interest in the stipulation to appoint Samuel Weinrott as special master, and it does not contend that the services of the master render the proceedings a nullity. It does contend, however, that the master's fee should be imposed upon the plaintiffs.

Defendant contends that, if any benefits accrued to the active members, the petitioners representing such

members should seek compensation from the individuals involved. The petitioners' answer is threefold:

1. It would be grossly unjust and inequitable to compel counsel to institute 193 separate suits in assumpsit when one of the foundations of equitable jurisdiction is the avoidance of a multiplicity of suits;

2. The active members are, in fact, the majority in control of the club solely by reason of this litigation and the efforts of the petitioners;

3. Defendant club welcomed and sought their active participation and support and thus directly benefited from their intervention.

What was the net result of all of this negotiation and litigation? The liquidation of the club was prevented, and the club was greatly benefited; it has been strengthened, properly organized, and placed on the right path for the future success of its operations. The club is the prime recipient of all the benefits derived from this litigation. Strangely enough, all the parties involved in this litigation were both benefited and disappointed. Compromises, of course, had to be made and no group obtained what it would have liked to obtain. Each group made necessary concessions in order to effectuate the plan.

Both factions of the proprietary members gave up their claims to exclusive ownership in return for a fraction of their demanded compensation for the relinquishment of these claims. The active members had to withdraw their objections to any payment to the certificate holders and, in return, received what amounted to an equity of approximately $6,000 per active member which they never claimed or had before this litigation. They have benefited greatly, and, since they now are the club, the club also has benefited.

The court must now determine who shall bear the costs necessarily incurred in the protracted negotiation

and completion of this reorganization of Cedarbrook Country Club. We need not consider plaintiffs' contention that their original suit was in the nature of a shareholders' derivative suit, for the result would be the same as the result this court reaches. This court finds that all the costs of these proceedings, including the counsel fees and costs of plaintiffs, the counsel fees of the active members of the club, the counsel fees and costs of the nonmember certificate holders, and the fee of the master, should be borne by the prime recipient of the successful completion of their labors; the only entity involved that did not suffer in the least and benefited the most, defendant, Cedarbrook Country Club. The court imposes these fees upon the club in exercising its powers in equity: Barndollar v. Groszkiewicz, 178 Pa. Superior Ct. 110, 113 A.2d 154 (1955); Gordon v. Hartford Sterling Company, 350 Pa. 277, 38 A.2d 229 (1944); Melown v. Penn Real Estate Company, 121 Pa. Superior Ct. 209, 183 Atl. 669 (1936); Miller v. Miller, 118 Pa. Superior Ct. 45, 179 Atl. 251 (1935); National Accident & Insurance Co. v. Workmen's Circle, Inc., 289 Pa. 164, 137 Atl. 184 (1927); Pennsylvania Company for Insurance on Lives and Granting Annuities v. Philadelphia National Bank, 195 Pa. 34, 45 Atl. 648 (1900); Grim v. Walbert, 155 Pa. 147, 25 Atl. 1077 (1893); Piper v. St. Paul Trust Co., 140 Pa. 233, 21 Atl. 317 (1891); O'Hara v. Stack, 90 Pa. 477 (1879).

Regardless of what may have been the original desires of any of the parties involved, this settlement and resuscitation of the club could have been achieved only by the cooperation of all counsel and by the sacrificing of individual desires in order to ensure the survival of the club. What may have started as a Civil War ended as a War of Independence, and the petitioners and the club were not enemies but allies. In fact, the petitioners were the generals for the club, and

the club was eventually victorious in this battle for its very survival. Its generals now come to this court asking that the club pay them for their services.

Plaintiffs' counsel request a fee of $40,000 less $17,550 paid to them by their clients. This is based upon 156 hours devoted to this litigation by Thomas Masterson, the value of whose services were submitted to be $35 per hour; by Fred DiBona, a total of 239 hours at $50 per hour; and James Masterson, a total of 306 hours at $75 per hour. Testimony by prominent members of the Philadelphia Bar on behalf of all counsel for plaintiffs substantiated the fees requested as fair and reasonable. In addition to this, plaintiffs' counsel has incurred costs in the sum of $927.50.

The master has requested a fee of $20,000. All parties to this litigation recognize this fee as fair and, indeed, most reasonable.

Counsel for respondents have devoted a total of 130 hours to this litigation and have expended costs in the sum of $19.30. We consider $30 an hour requested a fair and reasonable sum for such services which total $3900.

Lastly, counsel for the active members have devoted a total of 200 hours to this litigation for which they have received from their clients the sum of $1,000. We consider $30 an hour a fair and reasonable sum for such services which total $6,000 less $1,000 paid to them.

This court, therefore, enters the following

### Order

And now, this December 10, 1962, counsel fee in the sum of $22,450 and costs in the sum of $927.50 are awarded to James F. Masterson, Fred DiBona and Thomas Masterson, Esquires, counsel for plaintiffs; a fee of $20,000 is awarded to Samuel Weinrott, Esquire, the master; a fee of $3,900 and costs of $19.30 are awarded to Dechert, Price and Rhoads, Esquires,

66

counsel for the respondents; and a fee of $5,000 is awarded to Thomas J. McCormack and Michael Shekmar, Esquires, counsel for the active members.

All of the foregoing costs and fees are imposed upon defendant, Cedarbrook Country Club.