1887.]          OF ALABAMA.          23

[The State, ex rel. McNeill v. Bibb Street Church.]

# The State, *ex rel.* McNeill *v.* Bibb Street Church.

*Application for Mandamus for Restoration to Ministerial Office and Emoluments thereof.*

1. *Mandamus to church, or church trustees, to compel admission or restoration of minister ejected or excluded.*—The courts of the country have jurisdiction, by *mandamus*, to restore a minister, or other person, to an ecclesiastical or spiritual office, from which he has been wrongfully removed or excluded, when temporal rights, such as agreed salary, stipends or emoluments are annexed to the office and belong to the incumbent; but, when no temporal rights are involved, the courts decline to interfere, and leave the parties to settle their disputes by the constitution and rules of their particular church, or ecclesiastical organization.

2. *Same.*—When the organic law of the church, or ecclesiastical organization to which it belongs, has provided rules and regulations for the settlement of disputes between a minister and his congregation, or the church trustees who have control of the building and property, the courts will not interfere by *mandamus* until there has been a final decision by the proper church authorities.

APPEAL from the City Court of Montgomery.

Heard before the Hon. T. M. ARRINGTON.

This was an application for a writ of *mandamus* directed to the Bibb Street Church, or the Montgomery Station of the Methodist Protestant Church, the church trustees and church stewards, commanding the rescission of a resolution refusing to receive the Rev. H. H. McNeill as their pastor, and the restoration of said McNeill to the position of pastor of said church and to the emoluments of the pastorate, to which he had been appointed by the annual conference of the Methodist Protestant Church in Alabama. The opinion of the court sufficiently states all facts necessary to understand the legal questions decided.

RICE & WILEY, for appellant.—1. "The office of a writ of *mandamus* is, to require the person or persons to whom it is directed to do some particular thing therein specified, which appertains to their office and duty, and which the court issuing it has previously determined, or, at least, supposes to be consonant to right and justice." If the party making the application has a legal right, and no other specific adequate

[The State, ex rel. McNeill v. Bibb Street Church.]

legal remedy, the writ generally goes.—*Wilson v. Supervisors*, 12 Johns. 415, and authorities there cited; *King v. Turkey Co.*, a company of merchants, 2 Barr. 942, 999–1004; *Runkel v. Winemiller*, 4 Har. & McHen. 429, recognized in 12 Peters, 620; see other cases cited in *People v. Steele*, 2 Barb. Sup. Ct. R. 401; Jones, *Ex parte*, 1 Ala. Rep. Mandamus is proper remedy in this case.—*Rex v. Blooer*, 2 Burrow's Rep. 1043; *Rex v. Turkey Company*, 2 Burrows, p. 999. (This last case was a mandamus to admit a Quaker upon his simple affirmation—he having refused to take the oath prescribed by law—into the freedom of the Turkey Company. The writ was made peremptory). See, also, *Rex v. Barker*, 3 Burrows, 1265; *People v. Steele*, 2 Barb. Rep. 397; *Jacob Feizel v. The. Trustees of the First German Society of the M. E. Church of Wyandotte City*, 9 Kansas, 592; *Runkel v. Winemiller*, 4th Harris & McHenry's Rep. (Maryland), p. 429. "Religion is of general and public concern, and on its support depend, in great measure, the peace and good order of government, the safety and happiness of the people. By our form of government, the Christian religion is the established religion; and all sects and denominations of Christians are placed upon the same equal footing, and are equally entitled to protection in their religious liberty. The principles of the Christian religion cannot be diffused, and its doctrines generally propagated, without places of public worship, and teachers and ministers to explain the Scriptures to the people, and to enforce an observance of' the precepts of religion by their preaching and living. *And the pastors, teachers and ministers of every denomination of Christians are equally entitled to the protection of the law, and to the enjoyment of their religious and temporal rights;* and the court are of the opinion that every endowed minister of any sect or denomination of Christians, *who has been wrongfully dispossessed of his pulpit* is entitled to the writ of *mandamus* to be restored to his function, and the temporal rights with which it is endowed.—See 4th Harris & McHenry's Rep. *supra*, 450; see, also, in this connection, *People v. Steele*, 2 Bar. *supra*, 414 and 415; see, also, *Watson v. Jones*, 13 Wallace, 680, 722, 723 to 727; *Lynd v. Menzies et al.*, 33 New Jersey (law), 166, 167, 168; *Nachtrieb v. Harmony Settlement*, 3 Wallace, Jr., 66; *Ex parte Weatherly's Case. Mandamus* will lie both against the trustees and stewards of the church, because, although their duties may be different, they were acting together in the

[The State, ex rel. McNeill v. Bibb Street Church.]

prosecution of a common design to exclude the pastor from the pulpit, church and parsonage, and to prevent him from getting out of the church property the support and maintenance to which he was entitled. They represented the church, as a body, in their violent and undutiful conduct. *Stewart v. The State*, 26 Ala. 47. The relator was an "endowed minister." To his functions as *minister* and pastor emoluments were attached. This explanation or definition is given in the case of the *People v. Steele*, 2d Barb., on page 419. Being wrongfully dispossessed of his pulpit, he is entitled to the writ of *mandamus* to be restored to his functions and the *temporal* rights with which it is endowed. *Runkel v. Winemiller*, 4 Har. & McHen. 430, *supra*, and 2d Barbour, 419; *Rex v. Barker*, 3 Burr. 1265.

SHAVER & HUTCHESON, and THOS. H. WATTS, *contra.* The demurrers filed in this cause, raise several questions, both as to the law of procedure and substantive law. Appellees contend that a peremptory writ of *mandamus* should not issue—1st. Because it does not appear that the local church at Montgomery, nor the Methodist Protestant church at large in this State, is an incorporated body, either public or private, under the laws of the State of Alabama, nor that it is a public officer, nor an inferior court, nor that relator seeks to enforce any public right.—High Ex. Leg. Rem. §§ 1, 297, 298; Moses on Man. 16, 18; 2 Perry on Trusts, § 732; Tapping on Man. *12. 2d. Such writ, running in the name of the State of Alabama, will not issue at the instance of a corporation, nor of one claiming right and title thereunder as an agent or appointee thereof, if it be true that the Methodist Protestant church is incorporated under the laws of the State of Maryland, to enforce a right growing out of the government, or laws of such corporation.—*Lamphere v. United Workmen*, 47 Mich. 429. 3d. If such writ will issue at the instance of a foreign corporation, or of one claiming right and title thereunder, it does not appear that the Methodist Protestant church is incorporated under the laws of Maryland; such incorporation being averred merely upon information and belief of relator. The averment is insufficient. An Alabama court can not take judicial notice of a foreign act of incorporation. It does not take judicial notice of a private act of incorporation in Alabama. The alleged corporation, if incorporated at all, is a private one. The charter of a private corporation should be set out in the petition.—Tapping on Mandamus, *293,

*186; Angell & Ames on Corporations, § 698 (11th Ed). 4th. But if the existence of such corporation is sufficiently averred, it can not do any business in the State of Alabama without having at least one known place of business and an authorized agent therein.—Const. of Alabama, Art. xiv, § 4, p. 47; *American Union Tel. Co. v. Western Union Tel. Co.*, 67 Ala. 26. The legislature, at its last session (Sess. Acts 1886-7, p. 102), passed an act to give force and effect to this constitutional provision. This statute points out the mode of declaring and making known the designated place of business and the authorized agent or agents thereat. It provides that such foreign corporation shall file in the office of Secretary of State at the capitol in Montgomery an instrument in writing, under the seal of the company and signed officially by the President and Secretary thereof, designating such place of business and the authorized agent or agents residing thereat; and declares it unlawful, and provides a penalty, for any person or agent for or on behalf of such corporation, or such corporation itself, to transact any business before this requirement has been complied with. Relator avers that such alleged foreign corporation has "known places of business in the State of Alabama; that for many years last past it has had preachers, ministers and known agents in said State of Alabama," &c. Appellees insist that· this averment does not show compliance with the statute above referred to, or with the constitutional requirement; that it is merely the statement of a legal conclusion; that it does not appear what and where are its known places of business; who and where are its known agents; and, finally, that if by such averment it intends to say that its preachers are agents, and church buildings are its places of business, that such preachers and church buildings are·no where designated by name and place, and that they are not such authorized agents and known places of business as are designed and intended by the constitution of this State. 5th. The peremptory writ should not issue because of "multifariousness" in the mandatory clause of the alternative writ. 6th. The peremtory writ should not issue because of "misjoinder" of respondents. In discussing this question, constant reference must be made to the mandatory clause of the writ, which appellees contend to be fatally defective in many respects, to-wit: 1. It is multifarious. 2. Respondents are misjoined. 3. Necessary parties are not made respondents. 4. Respondents, jointly, are commanded to per-

[The State, ex rel. McNeill v. Bibb Street Church.]

form certain acts, which, singly or collectively, they have no authority to perform. 5. Certain things are commanded to be done which can not be enforced in case respondents fail to obey. 6. It nowhere appears who, or what, is one of respondents, nor how such respondent can be ordered to perform, or made to perform, what is required. 7. All the respondents are commanded to perform certain acts, which can only be done by one of respondents. The general principles and rules of pleading prevail in cases of *mandamus*, so far as applicable to the subject-matter, and in the absence of statutory regulations to the contrary, the practice is governed by the rules established at common law.—High on Ex. Leg. Rem. § 448; Tapp. on Man. See star pages 8 (note *y*) and 309. It is well settled that the peremptory writ must go, or run, in the terms of the alternative writ, or not at all. Tapp. on Man., star pages 409 and 305; High on Ex. Leg. Rem. §§ 539, 542; *State v. Supervisors of Beloit*, 20 Wis. 85. 7th. Relator must show that, by the alleged action of the respondents, he has been deprived of some fixed, certain and positive *legal temporal* right, as distinguished from ecclesiastical rights, or church privileges. He must show that there is a fixed stipend, or endowment, attached to the pastorate of the church, that respondents have no right to withhold from him such stipend or endowment.—Tapp. on Man. p. 116, *118; *Rex v. Barker*, Burrow's Rep. 1268; *Rex v. Blooer*, Bur. Rep. 1043; *Union Church v. Sanders*, 1 Houston (Del.) Rep. 123, 127, 128; High on Ex. Legal Rem. § 71, and authorities therein cited; Moses on Man. 182. No contract between relator and respondents in regard to his salary exists, or is alleged to exist. Section 4, Art. I, of the Constitution of Alabama, Declaration of Rights, declares, "that no one shall be compelled by law . . . to pay any tithes, taxes, or other rates . . . for maintaining any minister or ministry." The payment of the pastor's salary is voluntary and can not be enforced. It is averred in the petition and alternative writ, that the respondent church owns certain property, the rents, incomes and profits of which it has been the custom to use toward discharging the pastor's salary. The discipline of the church shows conclusively that the local church has absolute power to devote and use its property for such church purposes as it sees fit. It can direct the trustees to "purchase, build, repair, lease, sell, rent, mortgage, or otherwise procure or dispose of its property." It may use the rents, incomes

and profits to pay the pastor, to repair the church, build one, or add to it; build houses to rent, support its poor, send missionaries to, or bring converts from China or Japan. It may do all, or any one, of these things, if it sees proper. Its property may be out of repair, and the entire rents and incomes for one or more years could be used to put it in order. No preacher, conference or body can prevent such use. It appears in the writ that this property was acquired by the respondent church in the year 1841. It further appears that two (2) Disciplines of the Methodist Protestant Church are made part of these proceedings. One, the Discipline of 1886, the other, that of 1847; the latter Discipline is the one adopted at the organization of the M. P. Church in 1830, and unchanged and unamended up to, and inclusive of, 1847. The discipline of 1886 is the original Discipline as amended by subsequent General Conferences of the church. Both disciplines sustain appellee's views of the ownership of property by the individual churches. The Discipline in force at the time property was donated to, or acquired by, the individual churches obviously governs in regard to such property where material differences occur in the two Disciplines. The sections of both Disciplines bearing on the question of the ownership and use of such property are here cited.—Discipline, 1847, Art. IV, § III, p. 18; Discipline, 1886, Art. IV, § III, p. 18; Discip. 1847, p. 70, Gen. Duties of Trustees, 1, 2, 3, 4; Discip. 1886, pp. 109, 110, 111, Gen. Duties of Trustees, 1, 2, 3, 4, 5, 6. Attention is called to section 5 of Discipline of 1886, on p. 110, as showing that the more recent law of the church, as well as that of 1847, recognizes the ownership of the property in the individual churches. If a lawfully appointed pastor and church trustees had entered into a duly authorized contract, whereby such pastor was to be paid his salary, or a portion thereof, out of such proceeds, and to use a certain building as a parsonage, and to serve as pastor for their church and congregation, this would present a case different from the one at bar. But even in this event, on the refusal of such trustees and church congregation to comply with the contract, the pastor would have a remedy, and a complete one in equity, either by mandatory injunction, or by bill for specific performance, or by bill against the trustees to enforce the trust. The pastor would also have remedies in the common law courts. In no event would he have a remedy by *mandamus* if the church society were not *incorporated*. The issue would be purely a

question between *private persons*. If the individual church
owns its property, then it appears there is no endowment of,
or stipend, or legal temporal right attached to the pastorate
of respondent church. If there be no stipend or endowment
or legal temporal right attached to such pastorate, the per-
emptory writ applied for in this cause must be denied. The
case cited above in 1 Houston (Del.) Reports, p. 123, seems
conclusive on this point. The opinions of the chancellor and
two of the justices collect and refer to all the leading author-
ities, and strengthen them by their conclusion therein. The
Disciplines attached to, and made part of relator's petition,
must govern and overrule relator's averments as to what is
the law of the church, wherever they come in conflict.
8th. If the court should hold that relator has shown that
the respondent church has refused to conform to, and has
violated the provisions of, the constitution and Discipline of
the M. P. Church, then relator's remedy is not in the civil
courts, but in the *trial* of the church under the provisions
therefor in the Discipline.—See Discip. of 1886, p. 59; title
Trial of Churches. This remedy under the church law, is
*complete, exhaustive*, and *exclusive*. It is not a permissive
remedy, but it is made *mandatory* on relator to pursue it.
It is made the pastor's duty to try the respondent church be-
fore the tribunal therein provided. The Discipline provides
for a court of five persons with a presiding judge, a secre-
tary or clerk of the court, who shall keep the minutes of the
proceedings; the accused is given the right of challenge, five
(5) in number, to the court of five; a copy of the charges,
an indictment, must be furnished the accused twenty (20)
days before the day of trial; if found guilty, the punish-
ment of expulsion is declared; and the defendant is given
the right of appeal.—See Discip. 1886, pp. 59 and 60. The
complete machinery of a court is here set out. What court
so competent to decide in a matter involving a violation of
church or ecclesiastical law? A means is thereby provided
to keep churches and ministers from the scandal of trials and
litigation in the courts of law. And relator, when he con-
nected himself with the Methodist Protestant Church, and
became a minister therein, undertook and promised to be
governed by its laws, and in case such a controversy, as set
out in his petition, arose, that he would bring the respondent
church to trial, not before the civil courts, but before the
ecclesiastical tribunal provided for by the laws of the church.
*Non constat*, if the respondent were summoned before this

ecclesiatical court, the respondent would be found guilty of any violation of church law. It is well settled that the civil courts will not interfere in ecclesiastical disputes, where there is a remedy under the church laws.—*German Reform Church v. Sibert*, 3 Penn. 291; High on Ex. Leg. Rem. § 298 (latter part); Angell & Ames on Corp. §§ 704, 684, (11th Ed.) 9th. Under the fundamental law and spirit of the Methodist Protestant Church, the pastor appointed by an Annual Conference to any local or individual church can not force himself upon such church contrary to the wishes of such church, or a majority of its members. In support of this proposition we cite the provision for Trial of Churches, Discip. of 1886, 59, 60. If the church is found guilty of disobedience, it is expelled—the pastor is not forced on the church, he is not ordered to take charge of the building and preach. The idea of compelling an individual or local church into obedience does not seem to be entertained. Appellees maintain that the only reasonable interpretation of the clauses authorizing the annual conference to appoint ministers, see Discipline of 1886, 22, sections 3 and 4, is that the appointment or stationing of such ministers is to be made subject to the approval or consent of the stations or churches, as well as subject to the minister's right of appeal. This is implied or understood. It was not apprehended that the wishes of the church, as represented by its lay delegate to the Annual Conference, would be disregarded. This view of the case is strengthened and confirmed in the light of the history of the separation, or expulsion, of many members of the Methodist Episcopal Church, who formed and organized the Methodist Protestant Church, or "Associated Methodist Churches," as the church was originally called when organized in 1828–30. This movement, separation, and organization is a matter of history and consequently a matter of which the court will take judicial notice. What the Federalist is to the Constitution of the United States, that is Williams' History of the M. P. Church to the Constitution and Discipline of the Methodist Protestant Church. The authors of the Federalist papers were members of the Constitutional Convention in Philadelphia which framed the Constitution of the United States. The author of Williams' History of the M. P. Church was one of those expelled from the Methodist Episcopal Church, was a member of the convention which met in Baltimore, Md., and formed the Constitution and Laws of the Methodist Protestant Church. He was a

part of that of which he has written.   The closing chapter
of his history, pages 364 to 391, chap. XXI, titled "Remarks
on the Constitution," appellees cite as maintaining their
view, or construction of the laws of the church and giving
the right to a church to reject a minister to whom its mem-
bers are averse, and who says in his sworn petition in this
cause that he held a known unwillingness to serve as their
pastor.    Pages 297–8, and 322–3, and 284 of said history
are also cited.   The diametric positions of the Methodist
Episcopal Church and the Methodist Protestant Church as
to the respective rights of the ministry and laity are well set
out in the chapter cited, and also in the pamphlet titled
"The Contrast," which sets out the ecclesiastical polity of
the two churches and which was written by an eminent min-
ister and authority in the M. P. Church.   On pages 21 and 22
and page 25 of this pamphlet, the precise question here argued
is presented and answered in favor of appellee's contention.
10th.   The court has the power, in its discretion, to re-
fuse to issue the peremptory writ.   This discretion is un-
derstood to be a legal discretion, and not to be exercised on
light or trivial grounds against relator.   If it appear that
relator can pursue, or could have pursued, other remedies,
the discretion is then merged into a legal duty to refuse the
writ.   So, when the real nature of relator's application is
considered and understood, and the remedies he could have
resorted to are made known, this cause then presents itself
as of the very strongest character for the exercise of judicial
discretion in denying the application.   It appears from the
petition and writ, that the respondent church is opposed to
receiving relator as their pastor; in fact have refused him
admittance into the pulpit and parsonage.   The bringing of
the suit shows and admits this.   Relator avers in his sworn
petition that he had and entertained a known unwillingness
to serve as pastor of the respondent.   He had three remedies
and still has two remedies under the church law open to him.
It can not be made to appear that he stands in the attitude
of a martyr undergoing oppression and outrage, or of a
soldier fearlessly facing his duty and determined to discharge
it.   1st.  He had the right of appeal to the conference from
his appointment to this church or station.—Discipline of
1886, Art. VII, sec. 4, subd. 2, p. 22.   2d.  The president of
the Annual Conference may change him from this to another
station upon the consent of relator and the station.—Dis-
cipline of 1886, Art. XI, sec. 2, p. 28.   3d.  He may cause

the respondent church to be tried before the church court provided for in the Discipline.—*Ib.* pp. 59, 60. The relator, if deprived of any legal right, has a remedy both in courts of law and equity. If he has the right to possession of the church property, the building and parsonage, he can bring suit at law for such possession. If he is unjustly deprived of his salary, he can bring suit against the church stewards. If the officers of the church are illegally refusing to discharge the duties entrusted to them, relator can file a bill in equity for the enforcement of their trusts, and obtain a decree requiring them to discharge such duties in accordance with the law of the church. A mandatory injunction addressed to the proper parties would give relator full and adequate relief. If these civil remedies are not sufficient to deprive the court of jurisdiction to award the writ of *mandamus*, yet their existence "may and should influence the court in the exercise of its discretion in the particular case." High on Ex. Leg. Rem., §§ 20, 14, 9, 15.

CLOPTON, J.—Appellant applied to the City Court of Montgomery for a *mandamus* to compel the "Bibb Street Church" to rescind a resolution refusing to receive relator, as their minister or pastor, and to restore him to his office of such minister or pastor with all his rights and emoluments, and to compel the church and trustees to place him in charge of the church edifice and parsonage. The City Court dismissed the petition of relator, and from the judgment this appeal is taken.

The power of the civil courts to restore by *mandamus* a party, who has been wrongfully removed from an ecclesiastical or spiritual office, is well established, when the temporal rights, stipends, or emoluments are connected with, or annexed to, such office, which belong to the incumbent. In *Rex v. Blooer*, 2 Burr., 1043, the leading case, the exercise of the power was based on the ground that there was a temporal right. It is said: "A *mandamus to restore*, is the true specific remedy where a person is wrongfully dispossessed of any office or function which draws after it temporal rights, in all cases where the established course of law has not provided a specific remedy by another form of proceeding; which is the case with regard to rectories and vicarages." But, the courts are powerless to interfere where there are no fixed emoluments, stipends or temporal rights connected with the office; where it is purely ecclesiastical. The

foundation of the power to grant writs of *mandamus* is, a clear, specific legal right, and the want of an adequate legal remedy to enforce it. The absence of such right is fatal to any application for the writ. Under our form and theory of government every ecclesiastical system rests on the voluntary principle, and the support and maintenance of churches depend on voluntary contributions. No ecclesiastical organization in this country possesses *legal* capacity, unless incorporated, or unless it is acquired by a conveyance of property in trust for the use and benefit of the church. The fourth section of the declaration of rights provides: "That no one' shall be compelled by law to attend any place of worship, nor to pay any tithes, taxes or other rate, for building or repairing any place of worship, or for maintaining any minister or ministry." In the absence of a valid legal contract, the courts are prohibited to compel the payment of a minister's salary, or contributions for the support of the ministry or the church. In accordance with the principles of our institutions, and the organic law, the courts refrain from interfering when the office or functions are purely ecclesiastical or spiritual, disconnected from any fixed emoluments, salary, or other temporalities. In such case, there is no legal temporal right, of which the civil courts can take jurisdiction. *Union Church v. Sanders*, 1 Houston (Del.) 100.

The "Bibb Street Church" is a member of a larger and more important ecclesiastical organization, known as the "Methodist Protestant Church," consisting of quarterly, annual and general conferences, to the government of which it is subject, by the discipline of the church. Assuming the truth of the averments of the petition, the relator was duly appointed to the church, a station in Montgomery, by the duly constituted authorities. His office is purely ecclesiastical or spiritual, and unless there are temporalities connected with the church which belong to the pastor in respect of his functions, the application for a *mandamus* must be denied. The petition alleges that there is considerable real property connected with the station at Montgomery, including the church edifice, parsonage and other realty, which is held by trustees for the use and benefit of the Methodist Protestant Church, and which was conveyed in 1841 to trustees and their successors; that the trustees mentioned in the conveyance erected on the realty a church edifice for the preaching of the gospel in conformity to the rules and discipline of the Methodist Protestant Church, and a parsonage

3

as a dwelling-house for the minister and pastor during his pastorate, and other buildings under the direction and authority of the church, the annual rentals of which have been devoted and applied by authority of the annual conference, for a number of years past, to paying the current expenses of the station and the compensation of the minister, and have been, and are amply sufficient for these purposes.

In *Feizel v. Trustees*, 9 Kan. 592, the local church was a member of the organization known as the Methodist Episcopal Church. The church edifice was erected on the land conveyed upon the trust, among others, that the trustees should, at all times and forever, permit such ministers and preachers, as should from time to time be duly authorized by the general or annual conference of the Methodist Episcopal Church, to preach and expound "God's Holy word" therein. The court held, that if the trustees hindered a duly appointed minister "from preaching in the church, they are thwarting the expressed intention of the donor, and diverting the property from the channel of the trust in which he placed it. At this point the courts will interfere and restrain the diversion of the property from the trust." A *mandamus* was issued to restore the removed minister. In that case, the property was annexed to the local church, and belonged to the minister in respect of his office, under the rules and regulations of the church, and by the express terms of the conveyance. The deed to the realty connected with the "Bibb Street Church" is not set out in the petition, and we are not informed that it contained any specific uses and trusts. We must infer that the conveyance was in accordance with the regulations of the constitution of the church, which provides: "Each church shall have power, by the concurrent vote of two-thirds of the qualified members, present at a meeting publicly called together for that purpose, to purchase, build, lease, sell, rent, or otherwise obtain or dispose of property for the benefit of the Methodist Protestant Church;" and the same power is conferred by the discipline on the trustees of the local church.—Disc. 18, 110. It is further provided, that if any station shall become extinct in any manner, the church property shall vest in the Quarterly Conference, or, if there be none, in the Annual Conference, to be disposed of in erecting houses of worship for the church, after paying the debts of the local church. It is manifest from these provisions, that the property vests in the local church, until it becomes extinct, to be disposed of as authorized by two-thirds

of the qualified members. The constitution of the church further provides, that the Annual Conference shall be vested with power, "to make such rules and regulations as may be necessary to defray the expenses of the itinerant ministers, preachers and their families; to raise the amount of their salaries; and for all other purposes connected with the organization and continuance of said conferences."—Disc. 22. So long as the property is vested in, and subject to the disposition of the local station, the Annual Conference has no authority, without the consent of the local church, to direct any specific uses to which it shall be devoted; and if the church becomes extinct, the constitution directs how the property shall be appropriated. It is not averred, that any fixed salary has been agreed on; or that the rents of the property have been directed, by the requisite vote, to be applied to the payment of the pastor's salary; or that there has been any diversion of the property from the use and benefit of the Methodist Protestant Church, as declared by the conveyance, or by the rules of the church; or that the use of the property is annexed to the pastorate, so as to vest in the pastor a temporal right, of which the court can take jurisdiction. The allegations of the petition fail to sufficiently show any fixed emoluments, uses, or other temporal right, so as to authorize interference by the civil courts.

There is another objection fatal to granting a *mandamus* in this case. The petitioner avers that his deprivation of the possession of the church edifice and parsonage, and of his rights, emoluments and franchises, have been conducted without due authority, and in positive and direct violation of the constitution, laws and ordinances of the Methodist Protestant Church. The case made by the petition presents questions of ecclesiastical rule or law, and of church discipline—the pivotal question being whether, under the rules and regulations of the organization, the "Bibb Street Church" is bound to receive any minister, who may be appointed thereto by the Annual Conference? When a local church is a member, and under the government of a larger organization, and ecclesiastical tribunals are provided for the determination and adjudication of such questions, their decisions will be referred to such tribunals by the courts. The constitution of the Methodist Protestant Church provides for the trial of any church which shall, by any official act or declaration, evince a determination not to conform to the provisions of the constitution and discipline. It is made the duty of the pastor,

in such case, to make every reasonable and proper effort to induce the church to conform; and if such efforts prove unavailing, to nominate a committee of five male members, neither of whom shall be a member of the accused church, who shall constitute a competent court of trial, and shall decide the case. The accused church has the right of appeal to the Quarterly Conference, and if it be a station, to the following Annual Conference. The penalty prescribed is, that if the church "be found guilty of a departure from the constitution or the regulations of the discipline, it shall be declared no longer in connection with the Methodist Protestant Church." Disc. 59. Such tribunals having been provided for the trial and decision of such cases, the civil courts in the exercise of their discretion, will not grant a writ of *mandamus* to restore a rejected minister to his office and functions, before a final decision has been had by the church authorities.—*German Ref. Church v. Sibert*, 3 Penn. St. 282; High Ex. Leg. Rem. § 298. It is more promotive of the peace and good order of the church at large, and of the advancement of the principles of christianity, that resort should be had to the church judicatories, when they are provided by the constitution of the organization, for the decisions of such questions, than to the civil courts. The relator should be left to resort to the remedies provided and furnished by the constitution and discipline of the church.

Affirmed.

