The judgment is reversed, and the cause remanded.

---

### CUSSEN v. LYNCH.     (No. 2038.)

(Court of Civil Appeals of Texas. Amarillo. On Motion to Strike Out Statement of Facts, July 1, 1922. On the Merits, Nov. 22, 1922. Rehearing Denied Dec. 13, 1922.)

On Motion to Strike out Statement of Facts.

1. **Appeal and error** ⬦⟶644(2)—**Where statement of facts agreed to, it will not be stricken because containing some repetition.**

Where cause was first heard on plea in abatement, and later on the merits, and the agreed statement of facts included the evidence on both hearings, the statement of facts will not be stricken because the evidence on the two trials contained some repetitions and duplications; the rule being that the parties may make and agree to a statement of facts prepared in another manner than that pointed out by statutes, in which case appellee cannot object that Rev. St. arts. 1924 and 2070 were not observed.

2. **Appeal and error** ⬦⟶544(1)—**Bill of exceptions, rather than statement of facts, held not required.**

Where cause was first heard on plea in abatement and later on the merits, and the agreed statement of facts included the evidence upon both hearings, the contention that the testimony on the plea in abatement should be brought up by a bill of exceptions separate from the statement of facts, could not be sustained in view of Rev. St. art. 2062, for evidence taken on issues collateral to the main trial may be brought up either by bill of exception or in the statement of facts, and a statement of facts may be made to serve the purpose of a bill of exception.

3. **Appeal and error** ⬦⟶501(2)—**Exception to ruling on plea of abatement held sufficiently shown in record.**

Where cause was first heard on plea in abatement and later on the merits, and the agreed statement of facts included the evidence on both hearings, *held* that, an exception having been reserved to the ruling of the court on the plea in abatement at the time it was made, which was noted in the order of the court overruling the plea, this was a sufficient exception thereto.

4. **Appeal and error** ⬦⟶560—**Evidence may be set out in statement of facts, if facts are not agreed to.**

Under Rev. St. art. 2068, as to stating facts established rather than evidence thereof, if facts are not agreed to by the parties as established by the evidence, it is proper in the statement of facts to set out the evidence

adduced on the issues to establish the facts sought to be proven.

#### On the Merits.

5. **Religious societies** ⬦⟶25—**Validity of bishop's order of suspension of priest held not for the jury, in action to recover property in his hands.**

In trespass to try title by Roman Catholic bishop against suspended priest to recover church property, the case turning on the validity of the suspension, an ecclesiastical question, on appeal from judgment for plaintiff, in view of the presumption that the proceeding resulting in the order of suspension was regular, and in view of the facts that no clear showing of irregularity appeared in the record, and that defendant might have had the bishop's action reviewed by other tribunals within the church, *held*, that there was no error in the trial court's refusal to submit any issues of fact to the jury, and that defendant should be left to such review of the bishop's action by the proper church authorities.

Appeal from District Court, Hemphill County; W. R. Ewing, Judge.

Action by Right Rev. Joseph P. Lynch, Bishop of Dallas, against Edward J. Cussen. Judgment for plaintiff, and defendant appeals. Motion to strike out statement of facts overruled, and judgment affirmed.

Hoover, Hoover & Willis and Frank Willis, all of Canadian, for appellant.

George T. Burgess, of Dallas, and Sanders & Jennings, of Canadian, for appellee.

On Motion to Strike Out Statement of Facts.

HUFF, C. J. The appellee moves to strike out the statement of facts filed in this case: (1) Because pages 61 to 140 are duplicates of pages 1 to 61; (2) that pages 1 to 61 include all the testimony introduced on the defendant's plea of abatement, which it is asserted should have been presented by a bill of exceptions; (3) that the agreement of counsel shows it was not agreed to as a statement of facts, but that it is a statement of the evidence admitted by the court upon both the plea in abatement and upon the merits; (4) because the trial judge did not approve it as a statement of facts, but as the evidence upon both the plea and upon the merits; (5) because not prepared in accordance with the statutes and rules, which require the facts proven by evidence to be stated, and that they shall be stated and agreed to, and not the evidence establishing the fact, etc.

The appellee, Lynch, as bishop of the diocese of Dallas, alleged that all the property in such diocese is vested in him as such bishop; that the defendant Cussen unlawfully entered and took possession of certain property, describing it, and praying for judgment

---

therefor. The appellee, defendant below, pleaded in abatement of the suit that the matters in controversy, and upon which plaintiff bases his right of recovery, are pending on appeal for their determination before the proper church authorities under the laws and canons of the church, and that under such laws no civil suit can be prosecuted pending an appeal until final decision, which has not been had upon such appeal, also filing their answers to the merits of the case. On the 27th day of January, 1922, under agreement of the parties, the plea in abatement was heard before the court and before a hearing upon the merits of the case. The court heard evidence on the plea, and after doing so overruled the plea and ordered the case to proceed to trial upon the merits. The defendant at that time duly excepted to the action of the court, which exception was entered in the judgment of the court overruling the plea. The trial of the case was had upon the merits January 31, 1921, and resulted in favor of the plaintiff, from which judgment this appeal is prosecuted. The term of the court at which the trial on the abatement and the merits was had began January 9, and adjourned February 4, 1922.

[1] The first ground stated in the motion is not strictly true. If there are duplicates of the facts in some particulars they are not specifically pointed out. The certificate of the stenographer is as follows:

"I, W. R. Frazee, court reporter for the Thirty-First judicial district of Texas, hereby certify that the above and foregoing 140 pages contain a true and correct transcript of all the evidence admitted by the court in the trial of the above cause. Pages 2 to 60, inclusive, contain the evidence in support of and against defendant's plea in abatement. Pages 61 to 140, inclusive, contain the evidence admitted in the trial of said cause on the merits, as reflected by the shorthand notes' taken by me on the trial of said cause; the oral testimony being set out in narrative form directly from said shorthand notes, and the English translation from the Latin of the various exhibits being as originally translated from the witness stand, or as furnished in written translation by the parties."

The agreement of the attorneys for the parties is as follows:

"We, the attorneys representing plaintiff as defendant in the above cause, having read the foregoing transcript, and having found the same to contain a true and correct statement of all the evidence admitted by the court in the trial of said cause, both upon plea in abatement and on the merits, hereby agree that the same may constitute and be the statement of facts in said cause, and be used as such for purpose of appeal."

The trial judge's certificate is as follows:

"The above and foregoing statement of facts having been read by me, and having been agreed to and approved by the attorneys representing plaintiff and defendant in said above cause, the same is hereby approved and ordered filed." Signed by the judge.

There are two captions to the statement of facts, the first reading:

"Be it remembered that on the 27th day of January, 1922, the same being one of the days of the regular January term of the district court of Hemphill county, Texas, there came on to be heard in the above numbered and entitled cause the defendant's plea in abatement, whereupon the following facts were heard by the court, to wit."

Then follows the statement of facts on the plea in abatement down to page 61, where the following caption is entered:

"Be it remembered that on the 30th day of January, 1922, the same being one of the days of the regular term of the district court of Hemphill county, Texas, the court having heard the evidence adduced in support of defendant's plea in abatement, there came on for trial on the merits the above entitled and numbered cause, whereupon the following facts were admitted in evidence by the court, to wit: [Setting out the facts.]"

We have not examined the 140 pages of the statement of facts, to ascertain if there are duplicates made of some particular portions. We think, however, we may say from our examination that the ground first stated in the motion is not literally true. It will be noted from the agreement of counsel to the statement of facts that all the evidence had upon the plea and the trial on the merits may constitute the statement of facts and be used as such for the purpose of appeal. From this agreement and the stenographer's certificate we infer it was the purpose, as near as may be, to use the evidence had upon either trial upon the issues in both the abatement and the merits, without reference to whether it was offered in one or the other of such trials; that this was done in order to avoid the necessity of repeating in the two statements, where in both the same evidence was offered. Much of the record consists in ecclesiastical orders, notices, letters, and the like, which doubtless were material in both trials. The two trials could have been had together, or they could be tried separately. Having been tried separately at the same term of court, with only three days intervening, manifestly one statement of facts was a convenient method in preparing the appeal.

As we understand, the parties may make or agree to a statement of facts prepared in any other manner than that pointed out by the statutes, and when so made and agreed to it is binding upon the appellee, and he has lost his right to object that the provisions of articles 1924 and 2070 were not ob-

served in the preparation of the statement of facts. Railway Co. v. Prazak (Tex. Civ. App.) 170 S. W. 859; Buffalo Bayou Co. v. Lorentz (Tex. Civ. App.) 170 S. W. 1052; Fort Worth Publishing Co. v. Armstrong (Tex. Civ. App.) 175 S. W. 1113. There may be lack of harmony in the three cases cited on other points, but we believe the proposition stated by us has support in each of the cases. It would not be just, as we conceive the matter, to permit a party to agree to a statement of facts had upon trial, and after it is too late to prepare and file another, because of some possible repetition, to strike it out as not being in accordance with the statute or rules in that particular. The specific repetition, if any, it seems to us, should be pointed out in the motion, objecting to it in any event.

[2] The main contention we apprehend is that the testimony on the plea in abatement must be brought up by a bill of exceptions separate form the statement of facts. In the first place, a plea in abatement and the judgment of the court thereon is a matter of record and under article 2062, Revised Civil Statutes, a bill of exception was not required to bring up the ruling of the court thereon. If the matter pleaded required proof to establish the facts, the evidence thereon for and against can be brought up in a statement of facts. This we believe to be established by the various courts. Holmes v. Coalson (Tex. Civ. App.) 178 S. W. 628, where the question is thoroughly discussed by Mr. Justice Dunklin, in an unanswerable argument, we think. Trevathan v. Hall & Son (Tex. Civ. App.) 209 S. W. 447, follows the above case. This court recognized the right to bring up the evidence in a statement of facts which was had upon a motion to set aside a verdict. However, we regarded such evidence as not being part of the trial on the main issue, and that as it partook in its nature of a bill of exception, and as a bill of exception, as announced by the Court of Criminal Appeals, was required to be filed during term time, we concluded to follow the holding of that court. Smith v. Texas Power & Light Co. (Tex. Civ. App.) 206 S. W. 119. In the case of St. Louis, etc., Railway Co. v. Vick (Tex. Civ App.) 210 S. W. 247, our position as to the time of filing the statement of facts on the motion was criticized and dissented from. The writer of this opinion also wrote the former opinion of this court, and now takes occasion to assent to the able opinion of Mr. Justice Moursund in the Vick Case, supra.

In these cases and in others that might be cited, it is the rule, as we understand, that evidence taken upon collateral issues to the main trial may be brought up either by bill of exception or in the statement of facts. On this point we refer to the Vick Case. Also as to bringing up bills of exception by the statement of facts under our practice we refer to a very full discussion of this matter by our Supreme Court in Stephens v. Herron, 99 Tex. 63, 87 S. W. 326. In Roundtree v. City of Galveston, 42 Tex. 612, our Supreme Court held a bill of exception was not a statement of facts under our procedure, but said:

"In our liberal practice, discarding mere matters of form, the statement of facts may be made to serve the purpose also of a bill of exceptions; for the reason that it has upon its face the concurrent assent of the parties and the court."

[3] An exception having been reserved to the ruling of the court on the plea in abatement at the time it was made, which was noted in the order of the court overruling the plea, was a sufficient exception thereto. Railroad Co. v. Weber, 109 Tex. 383, 210 S. W. 677. The evidence on the trial of the plea was agreed to in a statement of facts for the entire trial under the statute and rules in order to bring up the question on appeal on the action of the court on the plea as well as upon the merits. An appeal could not have been prosecuted from the interlocutory order of the court on the abatement proceedings. It seems to us the method adopted in this case is simple and direct, and one well calculated to obtain a decision, both on the abatement proceedings and upon the trial on the merits, and should be commended rather than condemned.

[4] It also seems that, because the evidence is set out, and not the facts established by the evidence, that the appellee contends on that ground that the statement of facts violates the statute and rules. The practice of agreeing to facts established is to be encouraged; but, if counsel cannot agree upon such facts, we do not know of any rule or statute requiring the courts to compel such agreement, under the penalty of having the statement stricken out. Article 2068, R. C. S., on this point provides:

"Where it is agreed by the parties to the suit, or their attorneys of record, that the evidence adduced upon the trial of the cause is sufficient to establish a fact or facts alleged by either party, the testimony of the witnesses and the deeds, wills, records, or other written instruments, admitted as evidence relating thereto, shall not be stated or copied in detail into a statement of facts; but the facts thus established shall be stated as facts proved in the case," etc.

If the facts are not agreed to by the parties as established by the evidence, certainly it is proper to set out the evidence adduced upon the issues to establish the facts sought to be proven.

The motion will be overruled.

### On the Merits.

BOYCE, J. [5] Right Rev. Joseph P. Lynch brought this suit in trespass to try title against Rev. Edward J. Cussen, to recover lots Nos. 5. and 6, in block 82, in the town of Canadian. The defendant answered by plea of not guilty. The case was tried before a jury, and judgment rendered for plaintiff on an instructed verdict.

The plaintiff was bishop of the Roman Catholic Church for the diocese of Dallas. The town of Canadian is situated in this diocese, and the title to the property in controversy was vested in the plaintiff as Bishop of Dallas by a conveyance from the former owner "to the Right Reverend Catholic Bishop of Dallas, and his successors in the office of bishop" and their assigns. The defendant was a priest of the Catholic Church, and some time before the inception of this controversy had been appointed by the plaintiff to serve the church at Canadian. On June 11, 1921, the bishop declared the defendant "suspended from the exercise of the priestly office in any way whatsoever," and ordered him to enter a monastery at Gethsemane, Ky. The defendant refused to obey this order, and refused to deliver possession of the church property, whereupon the bishop brought this suit. The real controversy in the case is as to the right of the bishop to suspend the defendant and remove him from Canadian; it being defendant's contention that the order of suspension and removal was not in accordance with the canonical laws of the church. With this general statement in aid of a clearer understanding of the more detailed statement which follows, we may proceed to state the facts in greater detail.

The appellant was ordained as a priest some 10 years or more before the time of the controversy. It is admitted by him that during the early part of his ministry he had been addicted to excessive drink. In August, 1914, the bishop wrote the defendant that by verbal report and affidavits filed with him attention had been called to certain grave delinquencies committed by defendant to wit: First, that he drank to excess; second, that he gambled and associated with professional gamblers in places of bad repute; third, that he made use of outrageous language "that ought never to defile the lips of a priest." The bishop in this letter instructs the defendant to make a "spiritual retreat" of one week, followed by certain spiritual exercises for three weeks in Sacred Heart Abbey, Sacred Heart, Okl. This command was imposed by the bishop as a "preventive remedy," as provided by Cum Magnopere, art. 4. The defendant testified that on his return from this retreat at Sacred Heart Abbey he took up with the bishop in person the charges which had been preferred against him, and showed him that they were not well grounded, whereupon the bishop stated that he was going to throw the affidavits, etc., that had been filed against him, in the wastebasket. On November 11, 1914, the bishop instructed the defendant on pain of suspension, to go at once to St. Joseph's Infirmary at Fort Worth, and remain there pending an investigation of delinquencies charged against him. On June 10, 1915, the defendant, while in retreat at the University at Dallas, signed a written pledge to abstain from drink for 5 years, and there is testimony that at this time the Bishop publicly admonished the defendant and passed complaints then pending against him because of the fact that he had taken the pledge. The defendant, however, denied the fact of the admonition. Defendant testified that at some time, the date not being fixed, he voluntarily entered into retreat at the Monastery of Gethsemane, Ky. His testimony is to the effect that the monastery was practically a prison, in which conditions were very unsanitary and the priests treated as convicts. On December 23, 1915, the bishop executed and delivered to defendant an instrument in writing, known in the church laws as a precept. Omitting the immaterial parts thereof this precept reads as follows:

"Whereas, it is now five years past since your ordination to the holy priesthood, from the very beginning of which your conduct has been such as not only to impair your own spiritual, mental and physical health but often it has been the occasion of scandal to the faith as is fully proven by the records in the curia of this diocese; and whereas, frequently you have been warned and admonished about your delinquencies and even punishment has been meted out to you for the same:

"Now, therefore, you, Rev. E. J. Cussen, are hereby admonished and firmly enjoined from entering the city of Fort Worth, Texas, under any pretext whatsoever; from entering or frequenting saloons or any other public or quasi public place where liquor is sold, dispensed or conveyed for the purpose of consumption; from membership, active or associate, in any club or organization, on whose premises intoxicating liquor is accustomed to be had or consumed; and also from gambling.

"We enjoin upon you additionally that you practice sobriety. We solemnly admonish you to obey each and every one of the above enumerated precepts, and we hereby warn you that any and every violation of said precepts will be punished by suspension and other repressive remedies as provided by the sacred canon."

This instrument was executed and delivered with the formalities prescribed by the church laws.

On May 27, 1920, defendant was in retreat at Subiaco College, Ark., on account of alleged delinquencies with reference to drink, and the bishop wrote him that additional information had been received since defendant's departure with reference to matters in connection with his stay at Abilene and as

to certain occurences in Fort Worth during the summer of 1919. It is stated in this letter:

"Be sure to bear in mind that the precept given you in regard to Fort Worth is still in force."

In this same letter defendant was appointed to take charge of the station at Canadian, in this language:

"If it is your intention to return to this diocese you will please understand, and this declaration is made most emphatically, that you will not be permitted to loiter about, but you must confine your presence observatis observandis to the district to be intrusted to you. At this time the only church that is open for you in this diocese is that of Canadian, to which place you may go after your retreat, directly and immediately."

On January 11, 1921, the bishop entered the following order of suspension and removal, notifying defendant of such fact by formal letter, as follows:

"On December 23, 1915, you were placed under formal precept, whereby, among other things, you were directed to practice sobriety, and that you were warned that a violation of this precept would result in your suspension and in your incurring other canonical penances to be designated at the option of the ordinary (meaning the bishop or his superior). From information properly gathered, it appears that you have violated this precept frequently, and that at various times over a period of several years. Now therefore, because of your having violated said precept on September 27, 1920, and on December 24, 1920, and on April 7, 1921, but particularly and especially because of the violation of said precept on September 27, 1920, we hereby declare that you have fallen under censure mentioned in said precept, and that you have incurred the ecclesiastical penalties applicable to your case and we do, by these presents, declare you suspended from the exercise of the priestly office in any way whatsoever, and we direct that you proceed instantly to the monastery at Gethsemane, Ky., where you will make a spiritual retreat of ten days, and where you will reside until such time as some hope may be held out that you can be trusted to obey the ecclesiastical laws. * * * Thus do we act by virtue of the precept above mentioned and by authority of canon 2225 of the Code of Canon Law. You are warned not to repeat at Canadian anything that may resemble your conduct when you were leaving Abilene."

It appears that shortly before this order the bishop had sent Rev. Ellerd of Amarillo to Canadian for the purpose of making an investigation of reports as to defendant's misconduct. Rev. Ellerd had taken the sworn statements of some of the members of the congregation, and there had been forwarded to the bishop other sworn statements of persons not members of the church. No notice was given to defendant of the investigation, and he had no hearing before the order of suspension. The defendant stated that the grand jury had investigated the charge of public drunkenness against him, and no indictment had been found. He claimed that he was entitled to a hearing and trial on the charges before he could be legally suspended, and that he was supported in his position by a majority of the members of the church at Canadian. He testified that he demanded a hearing of the bishop after suspension, but was denied, and that he had appealed from the order of suspension to the apostolic delegate at Washington, and that the appeal was still pending at the time of the trial.

We will now refer to some of the church canons which were offered in evidence, and which may have some bearing on the controversy. Before doing so, however, we may say that in 1918 the laws of the Catholic Church, which had been promulgated during the preceding centuries, were authoritatively codified and published in a book called Codex Iurius Canonica. It is from this book that we make the quotations which follow. We should also say in this connection that the record contains a vast number of these canons and commentaries thereon of persons recognized by the church authorities as qualified to expound their meaning, and we mention only such of these as will be used in the discussion of the case.

The canons state that the bishops are the successors of the apostles and are placed by divine law over the individual churches. Canon 329.

Canon 335 reads:

"The bishop has the right and duty to govern the diocese in spiritual affairs as well as in temporal and to this end has legislative, judicial and coercive power which must be exercised according to the laws of the sacred canons. The laws of the bishop begin to bind immediately when promulgated unless he provides otherwise in the same laws. The manner of promulgation is determined by the bishop himself."

The bishop is intrusted with the administration of all "ecclesiastical goods" in his territory, and is authorized to "issue opportune instructions for the administration of business transactions concerning ecclesiastical goods." Canon 1517.

The bishop is authorized to make laws of a general nature and impose general precepts, and may also impose special precepts, applicable only to the individual. And it is provided that—

"Superiors who have the powers to make laws or impose precepts can also attach penalties to the law or precept." Canon 2220.

Canon 127:

"All clerics, but especially the priests, are under special obligation to obey and respect their respective ordinary."

### Canon 128:

"The office imposed on clerics by the bishop must be accepted and faithfully attended to as long as the bishop judges that the needs of the church and his diocese require the services of the priest."

### Canon 1933 reads in part as follows:

"Penances, penal remedies, excommunications, suspension, interdict can be inflicted also outside of the ecclesiastical court, by way of precept, provided the offense is certain."

### Canon 2193 is as follows:

"It is left to the prudent judgment of the ordinary (which in the canon law means the bishop or his superior) to make known to or to conceal from the cleric the cause or offense for which the suspension is inflicted; but if he thinks it well to make known the reason he should do so with pastoral solicitude and charity, so that the penalty, accompanied with paternal admonition, may serve not only for the satisfaction of the guilt but also bring about the amendment of the offender and serve to eliminate the occasion of sin."

Canon 2225, under which the bishop professed to proceed in this case, is as follows:

"If the declaration or infliction of the penalty is pronounced by judicial sentence the laws of the canon with reference to the pronouncement of judicial sentence are to be observed. If, however, the penalty of either latæ (attaching automatically in accordance with law) or ferendæ sententia (inflicted by decree of the bishop) is inflicted by way of special precept the declaration or infliction of the penalty should ordinarily be done either in writing or in the presence of two witnesses. Canon 2193 is also to be observed."

It seems to have been a general custom that a warning without threat of sentence should precede the issuance of a precept by the bishop but this was not an absolute prerequisite. In this connection see canon 2310, reading:

"If admonitions and reprimands have been given without producing results or if no effect can be hoped to be secured by them a precept should be issued in which is to be accurately stated what the person in question is to do and avoid, together with a threat of the penalty in case of transgression."

The church laws provide for an appeal from such order as the bishop made in this case. Such appeal might be taken to the archbishop over the territory in which the contest arose, and from his decision to the apostolic delegate (the personal representative of the Pope) at Washington, or to the Holy See direct; or, if the appellant saw fit, he could go over the archbishop in the first instance, and appeal direct either to the apostolic delegate or to the Holy See, as he preferred. Appeals are "in devolutivo," meaning that there is no suspension of the judgment pending the appeal, or "in suspensivo," where the sentence is suspended during such time. Canon 2243 provides in reference to such matter:

"Censures inflicted by a sentence in court import their execution as soon as they have been pronounced and an appeal in devolutivo only is granted: Likewise from censures inflicted by way of precept appeal in devolutivo only is permitted. In both cases therefore the censured cleric must conform to the censure during the time in which he has recourse to a higher superior."

The pastors of certain kinds of parishes were not removable (that is, at the absolute pleasure of the bishop), but three things were required to establish such a parish:

"(a) A decree or order of the ordinary, assigning the boundaries; (b) a parochial residence; (c) a sufficient endowment for the maintenance of the pastor and of divine worship."

None of these requisites, except possibly that of a parochial residence, though the record is silent as to such matter, obtain as to the church at Canadian, and it is conclusively established that the pastor of such church was removable at the good pleasure of the bishop of the diocese.

The civil courts have been frequently called upon to settle controversies originating in the churches, and there is more or less confusion and conflict in the various decisions. One rule seems to have met with general adherence: That the civil courts will not assume jurisdiction in cases involving only ecclesiastical questions; that a civil right of property must be involved before the civil courts will assume to settle the controversy. There is a property right involved here, to wit, the right of possession of the church property. This right, of course, the civil courts must litigate. The bishop has the legal title, and right of possession ordinarily follows the legal title. This is, of course, a legal right which the civil courts will enforce. The defendant's right to possession, if any, is dependent on the determination of an ecclesiastical question, to wit, his status in reference to the church, whether he has been suspended from office and removed from the pastorate at Canadian in accordance with the church laws. The defendant's right, if he has any, thus hinges upon the decision of an ecclesiastical question. It is generally conceded that when an ecclesiastical question has been decided by ecclesiastical tribunals, properly constituted and proceeding in accordance with the rules prescribed by the organization, such decisions are binding upon the civil courts in the trial of the dependent property rights. Brown v. Clark, 102 Tex. 323, 116 S. W. 360, 24 L. R. A. (N. S.) 670; Watson v. Jones, 13 Wall. 733, 20 L. Ed. 666; St. Vincent v. Murphy, 83 Neb. 630,

120 N. W. 187, 35 L. R. A. (N. S.) 925, and note. But when questions have been raised as to the "jurisdiction" of the church authority that has decided the question, or as to the regularity of its proceedings for the purpose of overturning in the civil courts the decision of the ecclesiastical question on which the property right in litigation may depend, we find confusion.

We think, so far as we are able to judge the meaning of the canons offered in evidence, aided by the commentaries and oral testimony offered in connection therewith, that the bishop had the power to make the order of suspension entered against the defendant, and are also inclined to believe that there was a substantial compliance with the canonical laws in the matter of the procedure. It is first insisted by the appellant that the precept of December 23, 1915, was invalid because it was not preceded by canonical warning and admonition. We are not referred to any law which in specific terms makes such warnings and admonition a prerequisite to the issuance of such a precept. Neither are we referred to any canon which defines what is meant by warnings and admonition. The defendant testified that he was an expert in canonical law, and that—

A "canonical warning is this: When charges are made against a priest the bishop investigates them, and if he finds that these charges are made by grave people and not malevolent people, and if there are sufficient grounds, and they can be substantiated against the priest, he makes known to him the charges without making known the names of the witnesses, and if the priest cannot explain away these charges the bishop then places canonical warnings to avoid certain delinquencies mentioned in the complaint, against the priest, but warning is not given until the priest is first heard in his own defense. The rule of the Catholic Church is that a canonical warning must not contain a threat of punishment."

This testimony is not entirely in accord with that of the other expert witness. But it seems to us that if admonition was necessary the letter of August, 1914, in which the attention of the priest was called to delinquencies charged against him, and a preventive remedy was imposed upon him, to which he submitted, was sufficient. But it is suggested that the effect of this instrument as an admonition was nullified when the bishop stated on the defendant's return from Sacred Heart that he was going to throw the papers into the wastebasket. If that was true, still soon thereafter, in November of the same year, the bishop is again found laying peremptory orders on the priest to remain in St. Joseph's Infirmary, pending an investigation of certain alleged delinquencies of the same character. The subsequent transactions with reference to this particular occurrence are not disclosed, though it seems rather probable that about this time the defendant made the voluntary spiritual retreat in the monastery at Gethsemane. There is testimony, though this is in dispute, that there was oral admonition in the year 1915, preceding 'the issuance of the precept. But in any event, the facts from the bishop's viewpoint would seem to have warranted the issuance of the precept under the terms of canon 2310, above quoted.

The second proposition is based on the contention that the effect of the precept of December 23, 1915 (appellant refers to it as an attempted canonical warning), was nullified when the bishop informed the defendant on his return from Sacred Heart Abbey in Oklahoma that he was going to throw the papers into the wastebasket. The facts do not support this proposition, The conversation on return from Sacred Heart evidently took place a year or more before the issuance of the precept of December 23, 1915. The St. Joseph Infirmary incident intervened between the return from Sacred Heart and the issuance of the precept. We find the bishop in 1920 instructing the defendant to undergo a spiritual retreat at Subiaco College, Ark., and defendant himself says that this was in connection with this same character of charge. While the bishop in the letter of May 27, 1920, called special attention to that part of the precept with reference to Fort Worth, there is no reason to believe that there was an intention to lift any of the other commands contained therein.

The fourth proposition asserts that there was error in overruling the defendant's plea of abatement because of the pendency of the appeal to the apostolic delegate; it being appellant's contention that the appeal suspended the enforcement of the order of June 11, 1921. Appellant contends that his proceeding before the apostolic delegate was in the nature of a "plea of nullity" as referred to in Smith's Elements of Ecclesiastical Law; the record containing several pages of discussion of such subject by that author. We have read this carefully, and do not think appellant's position as to the suspensive effect of the appeal is sustained thereby. We see no reason to doubt that this matter is controlled by the provisions of canon 2243, above quoted. We refer in this connection, without taking space to quote them, to the provisions of canons 1889, 1892, 1893, and 1894, appearing in the statement of facts. Appellant, in his brief, refers to several paragraphs of Smith's Elements of Ecclesiastical Law as being church canons. As we understand it, Smith was a professor in some of the church colleges, and wrote his book before the adoption of a new code of canon laws in 1918, and these several paragraphs are merely his comments on the law as he construed it at the time of the writing of the book.

Considerable is said in argument, though the propositions do not specifically present the point, as to appellant's right to notice and a hearing before suspension. In this connection references are made to canons that have only to do with proceedings in judicial trials. Under the specific provision of canon No. 1933 suspension might be inflicted "outside of the ecclesiastical court by way of precept, provided the offense is certain." Who is to judge of the certainty of the offense? Necessarily the one pronouncing the judgment. This conclusion is in keeping with the spirit of the canons, which appear to vest the bishop with large arbitrary and discretionary powers. It is even provided by canon 2193 that the bishop may suspend the priest without making known to him the cause therefor. Under canon 2225, when the suspension is made by way of special precept, all that is required is that it be done in writing or in the presence of two witnesses. This general discussion disposes of all the propositions urged by appellant.

But if we suppose that the evidence is sufficient to raise a question as to the applicability or meaning of the canons on which we have based our conclusion, yet it does not follow that appellant has a right to have these matters submitted to the decision of a jury. What we have already said shows: First, that the bishop was clothed with authority to enter the order of suspension, the contention being that the order in this instance was invalid because of irregularity in the proceeding; and, second, that the church laws provide for an appeal upon the hearing of which the action of the bishop might be reviewed and set aside. As we have already intimated, the courts are not in harmony as to the extent that they should go in reviewing the decisions of the ecclesiastical courts of questions which govern a property right being litigated in the civil courts. A leading case on the subject is Watson v. Jones, 13 Wall. 679, 20 L. Ed. 666. The latter part of the opinion is in point here. It is said in the opinion that "it is of the essence of religious unions" that the decisions of their constituted ecclesiastical tribunals as to "questions of faith within the association and for the ecclesiastical government of all the individual members, congregations and officers" should be binding, "subject only to such appeals as the organization itself provides." And it is shown that it would not be promotive of justice to submit such decisions to review in the ordinary judicial tribunal. "It is not to be supposed that the judges of civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would, therefore, be an appeal from a more learned tribunal in the law which should decide the case, to one which is less so." In discussing the extent to which the civil courts will go

in inquiring as to the "jurisdiction" of the ecclesiastical court or in reviewing the regularity of its proceeding, the court, after showing that in cases where the ecclesiastical court undertakes to determine a question not of an ecclesiastical nature, its judgment would be a nullity, says:

"But it is a very different thing where a subject-matter of dispute strictly and purely ecclesiastical in its character * * * becomes the subject of its action. It may be said here also that no jurisdiction has been conferred on the tribunal to try the particular case before it, or that in its judgment it exceeds the powers conferred upon it, or that the laws of the church do not authorize the particular form of proceeding adopted and in a sense often used in the courts; all of those may be said to be questions of jurisdiction. But it is easy to see that if the civil courts are to inquire into all these matters the whole subject of the doctrinal theology, the usages and customs, the written law and fundamental organization, may be and must be examined into with minuteness and care, for they would become in almost every case the criteria by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws, would open a way to all the evils which we have depicted as attendant upon the doctrine of Lord Eldon, and would in effect transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions."

This decision was approved by our Supreme Court in an opinion in the case of First Baptist Church v. Fort, 93 Tex. 215, 54 S. W. 896, 49 L. R. A. 617, as bringing "order out of the chaos which reigned among the decisions." In the case of Clark v. Brown, 108 S. W. 421, it was held by the Court of Civil Appeals that a certain decision of the General Assembly of the Cumberland Presbyterian Church was without authority of such body, and was not binding on the civil courts. The Supreme Court granted a writ of error, reversed the decision of the Court of Civil Appeals (Brown v. Clark, 102 Tex. 323, 116 S. W. 360, 24 L. R. A. [N. S.] 670), and in the opinion again approved the decision in Watson v. Jones, supra, saying of it that—

"Judge Miller * * * shows conclusively that the determination of an ecclesiastical court as to its jurisdiction over a given question is as conclusive upon the civil courts as is its decision of the question when made."

It must be stated, however, that this broad statement as to the finality of the decision of the ecclesiastical tribunal as to its own jurisdiction has not been universally approved. See notes 35 L. R. A. (N. S.) 922, 923. In the case of Connitt v. Reformed Protestant Church, 54 N. Y. 552, the New York court takes a middle position, and holds that if the decision of the ecclesiastical tri-

bunal as to its own jurisdiction is not final "yet * * * in all cases of doubt, when there is not clearly an absence of jurisdiction, the decisions of church judicatories as to their own jurisdiction in ecclesiastical matters should receive great weight." In this case the question is not so much one of jurisdiction, but as to regularity of the proceedings in a tribunal having jurisdiction. But the questions are akin, and the same conflict, based on the same considerations, arise in the determination of both questions. However, the New York court, in the case just cited, held that, when the jurisdiction of the church tribunal is established, inquiry cannot be made in the civil courts "as to whether they have proceeded according to the laws and usages of their church." There are other authorities to the same effect and others to the contrary. St. Vincent's Parish v. Murphy, 83 Neb. 630, 120 N. W. 187, note, 35 L. R. A. (N. S.) 924–925. See, also, note, 100 Am. St. Rep. 740.

Without attempting to formulate a statement of a general rule, we may close our discussion of this matter with the following statement of our conclusions reached in this particular case: The proper church authority has passed on the question of appellant's status with reference to his ministry in his church. This is a decision of an ecclesiastical question, and the question here raised is as to the regularity of the proceeding leading up to the declaration of the suspension. We are of the opinion that no irregularity of any consequence has been shown, but if the evidence is sufficient to raise a doubt as to this conclusion, we are fully convinced that no clear showing of any irregularity appears in the record. A presumption exists that the proceeding was regular. Olcott v. Gabert, 86 Tex. 121, 23 S. W. 987; Connitt v. Reformed Protestant Church, supra. The appellant might have had the action of the bishop reviewed on appeal to other tribunals within the church. Under these conditions we do not think there was any error in the refusal of the trial court to submit any issues of fact to the jury, and appellant should be left to seek a review of the action of the bishop by the proper church authorities, who are more competent to pass upon such matters than are we, or a jury of a trial court. Sawtell v. Feser (Tex. Civ. App.) 235 S. W. 960; State v. Bibb Street Church, 84 Ala. 23, 4 South. 40.

It is clear that the bishop had authority at his discretion to remove the defendant from the pastorate at Canadian, and it may be that the letter of June 11, 1921, and the institution of this suit, even if the attempted suspension of the defendant were held to be unauthorized, should operate as a removal of the defendant, and settle any controversy as to the possession of the church property at Canadian. Some authorities sustain the proposition that a minister's right to his office is not such a property right as will present a question cognizable by the civil courts, unless there is a fixed salary or agreement with reference thereto or emoluments or other "temporality annexed to the position," and that where, as in this case, the compensation which a minister may receive at a particular place is dependent upon voluntary contributions, with no contractual rights involved, the courts will not undertake to review the action of the church authorities in their removal of the minister from such position, whether such action be right or wrong. State v. Bibb Street Church, 84 Ala. 23, 4 South. 40; Union Church of Africans v. Sanderson, 1 Houst. (Del.) 100, 63 Am. Dec. 187; Runkel v. Winemiller, 4 Har. & McH. 429, 1 Am. Dec. 411; Rector of St. James Church v. Huntington, 82 Hun, 125, 31 N. Y. Supp. 91; Travers v. Abbey, 104 Tenn. 665, 58 S. W. 247, 51 L. R. A. 260; note, 35 L. R. A. (N. S.) 919–920. There is authority to the contrary. O'Hara v. Stack, 90 Pa. 477. We announce no conclusion as to these suggestions.

We are of the opinion that the judgment of the trial court should be affirmed.